UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES DISTRICT COURT
FILED
AUG 08 2019
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

KATHRYN JUNGER and ROBERT F.
DANZI, *as co-administrators of the estate
of George Edward Johnson, deceased*, and
KATHRYN JUNGER, *individually*,

Plaintiffs,

v.

HARPREET SINGH, M.D.,
CHRISTOPHER MALLAVARAPU, M.D.,
ASHOKKUMAR J. KOTHARI, M.D.,
OLEAN GENERAL HOSPITAL, TERESA
M. DEAK, M.D., ROBERT S. BUCKLEY,
M.D., and EXIGENCE MEDICAL OF
OLEAN PLLC,

Defendants.

**DECISION AND ORDER**

1:16-CV-00564 EAW

## **INTRODUCTION**

Plaintiffs Kathryn Junger ("Junger") and Robert Danzi, the co-administrators of the estate of George Edward Johnson ("Johnson" or "Decedent"), commenced the instant action on July 13, 2016, on behalf of both Johnson's estate and Junger individually.[1] (Dkt. 1). In the Amended Complaint, which is the operative pleading, Plaintiffs assert claims against Defendants sounding in medical malpractice and wrongful death. (Dkt. 4).[2] Junger asserts loss of consortium claims in her individual capacity. (*Id.*).

---

[1]    Junger is Johnson's widow, in addition to being a co-administrator of his estate.

[2]    The Amended Complaint also asserts claims based on lack of informed consent, but Plaintiffs have now voluntarily dismissed those claims. (*See* Dkt. 143).

- 1 -

Currently pending before the Court are motions for summary judgment filed by defendants Robert S. Buckley, M.D. ("Dr. Buckley") and Exigence Medical of Olean PLLC ("Exigence")[3] (Dkt. 119), defendant Teresa M. Deak, M.D. ("Dr. Deak") (Dkt. 120), defendant Ashokkumar J. Kothari ("Dr. Kothari") (Dkt. 122), and defendant Olean General Hospital ("OGH") (Dkt. 123). Defendants Harpreet Singh, M.D. ("Dr. Singh") and Christopher Mallavarapu, M.D. ("Dr. Mallavarapu") have not filed dispositive motions. Dr. Buckley, Dr. Deak, Dr. Kothari, Exigence, and OGH are hereinafter collectively referred to as the "Moving Defendants."

For the reasons set forth below, the Court grants Dr. Deak's motion for summary judgment, grants Dr. Buckley's and Exigence's motion for summary judgment, denies Dr. Kothari's motion for summary judgment, and grants in part and denies in part OGH's motion for summary judgment.

## FACTUAL BACKGROUND

The following facts are taken from the Moving Defendants' respective Statements of Undisputed Facts (Dkt. 119-2; Dkt. 120-17; Dkt. 122-19) and Plaintiffs' responses thereto (Dkt. 129-2; Dkt. 130-2; Dkt. 131-2), as well as the exhibits and declarations submitted by the parties. Unless otherwise noted, these facts are undisputed.

On August 4, 2014, at approximately 5:17 a.m., an ambulance crew from Ellicottville Great Valley Ambulance arrived at Decedent's location. (Dkt. 119-2 at ¶ 8; Dkt. 130-2 at ¶ 8). The ambulance crew documented Decedent's chief complaint as chest

_____

[3] Exigence is Dr. Buckley's employer and Plaintiffs' claims against it are based on Dr. Buckley's conduct. (*See* Dkt. 119-2 at ¶ 4).

pain of two hours duration with an "anatomic location: extremity-lower, chest." (Dkt. 119-2 at ¶ 9; Dkt. 130-2 at ¶ 9). The ambulance crew further documented that Decedent reported "8/10 chest and right leg pain" and "stated that he was feeling dizzy with shortness of breath and that he had vomited earlier." (Dkt. 119-2 at ¶ 10; Dkt. 130-2 at ¶ 10). Decedent was noted to have a medical history of deep vein thrombosis, diverticulitis, and hypertension, and to be taking Tywnsta, a prescription medication used to treat high blood pressure. (Dkt. 119-2 at ¶ 11; Dkt. 130-2 at ¶ 11). The ambulance crew provided initial treatment to Decedent, including administering oxygen, aspirin, and nitroglycerin. (Dkt. 119-2 at ¶ 13; Dkt. 130-2 at ¶ 13). At 6:07 a.m., the ambulance crew notified OGH that they were bringing in a "cardiac alert" and that Decedent was a potential candidate for a cardiac/myocardial infarction. (Dkt. 119-2 at ¶ 14; Dkt. 130-2 at ¶ 14).

The triage nurse at OGH documented that Decedent arrived in the emergency department at 6:20 a.m. (Dkt. 119-2 at ¶ 17; Dkt. 130-2 at ¶ 17). At 6:24 a.m., the triage nurse documented Decedent's presenting complaint as "chest pain started one hour ago. Have nausea with one episode of emesis." (Dkt. 119-2 at ¶ 18; Dkt. 130-2 at ¶ 18).

Shortly after Decedent arrived at OGH, Dr. Deak, an emergency medicine physician, performed an initial examination and ordered various diagnostic tests, including "an EKG, CBC, CKMB, CMP, CPK, PT/INR, PTT, Troponin, and a Chest X-Ray." (Dkt. 120-17 at ¶¶ 2, 4; Dkt. 131-2 at ¶¶ 2, 4). Dr. Deak testified at her deposition that she did not feel that a CT scan needed to be ordered during the time she treated Decedent, and that from her perspective, consideration of ordering a CT scan was something that would occur after the lab results had been returned and the patient had been reevaluated. (Dkt. 120-17

at ¶ 14; Dkt. 131-2 at ¶ 14).   Dr. Deak's differential diagnosis at this point in time included acute coronary syndrome, esophagitis, reflux, pulmonary embolism, Boerhaave's Syndrome, and aortic dissection; Plaintiffs and Dr. Deak disagree as to whether NSTEMI was also included.  (Dkt. 120-17 at ¶ 5; Dkt. 131-2 at ¶ 5).

An EKG was performed at 6:25 a.m. and reviewed by Dr. Deak, who "confirmed that it did not show any ST elevations." (Dkt. 120-17 at ¶ 3; Dkt. 131-2 at ¶ 3).  A portable chest x-ray was completed in the emergency department at OGH at 6:55 a.m.  (Dkt. 119-2 at ¶ 28; Dkt. 130-2 at ¶ 28).

Dr. Deak's shift on August 4, 2014, ended at 7:00 a.m., approximately 35 minutes after she first encountered Decedent. (Dkt. 120-17 at ¶ 6: Dkt. 131-2 at ¶ 6).  Apart from the Tropinin results, the other lab work ordered by Dr. Deak had not been returned prior to the end of her shift. (Dkt. 120-17 at ¶ 7; Dkt. 131-2 at ¶ 7).

At 7:17 a.m., Dr. Deak transferred care of Decedent to Dr. Buckley, who was working the day shift.  (Dkt. 119-2 at ¶ 30; Dkt. 120-17 at ¶ 8; Dkt. 130-2 at ¶ 30; Dkt. 131-2 at ¶ 8).  Dr. Deak testified at her deposition that she discussed Decedent's symptoms and her work-up with Dr. Buckley and that she "then signed the patient over to Dr. Buckley to perform whatever tests he felt were necessary." (Dkt. 120-17 at ¶ 9 (quotation omitted); Dkt. 131-2 at ¶ 9).  Decedent was signed out with "undifferentiated chest pain, pending lab work and imaging." (Dkt. 120-17 at ¶ 10; Dkt. 131-2 at ¶ 10).

At 7:19 a.m., Dr. Buckley documented that Decedent "report[ed] chest pain that is located primarily in the substernal area.  Onset: 2 hour(s) ago.  The pain does not radiate." (Dkt. 119-2 at ¶ 31; Dkt. 130-2 at ¶ 31).  After assessing Decedent, Dr. Buckley's

differential diagnosis included acute coronary syndrome, pulmonary embolism, and aortic dissection. (Dkt. 119-2 at ¶ 33; Dkt. 130-2 at ¶ 33). Dr. Buckley testified at his deposition that he believed the most likely diagnosis was acute coronary syndrome. (Dkt. 120-17 at ¶ 18; Dkt. 131-2 at ¶ 18).

Between 7:19 a.m. and 7:30 a.m., Dr. Buckley requested a consultation with Dr. Mallavarapu, an interventional cardiologist. (Dkt. 119-2 at ¶ 34; Dkt. 120-17 at ¶ 22; Dkt. 130-2 at ¶ 34; Dkt. 131-2 at ¶ 22). Dr. Mallavarapu saw Decedent in the OGH emergency department at 7:33 a.m. (Dkt. 119-2 at ¶ 35; Dkt. 130-2 at ¶ 35). Dr. Mallavarapu examined Decedent and determined that he was an appropriate candidate for a cardiac catherization. (Dkt. 120-17 at ¶¶ 24-26; Dkt. 131-2 at ¶¶ 24-26). At 7:35 a.m., Decedent was transported to the cardiac catheterization lab. (Dkt. 119-2 at ¶ 36; Dkt. 130-2 at ¶ 36). At 7:59 a.m., Dr. Buckley documented that Dr. Mallavarapu had ordered Decedent to be admitted to OGH. (Dkt. 119-2 at ¶ 39; Dkt. 130-2 at ¶ 39).

Decedent was prepped for the cardiac catheterization at 7:48 a.m. and Dr. Mallavarapu had completed the procedure by 8:36 a.m. (Dkt. 119-2 at ¶ 42; Dkt. 130-2 at ¶ 42). As part of the cardiac catheterization, Dr. Mallavarapu performed an aortogram, which is one of the four primary modalities used to diagnose a possible aortic dissection; the other three modalities are CT angiography, transesophageal echocardiography, and MRI. (Dkt. 120-17 at ¶¶ 33-35; Dkt. 122-19 at ¶ 1; Dkt. 129-2 at ¶ 1; Dkt. 131-2 at ¶¶ 33 35). Dr. Mallavarapu did not observe an aortic dissection at the time he performed the aortogram. (Dkt. 122-19 at ¶ 2; Dkt. 129-2 at ¶ 2). However, Dr. Mallavarapu has

subsequently acknowledged that the aortogram was indicative of an aortic dissection. (*See* Dkt. 130-12 at 118).

After the cardiac catheterization, Dr. Kothari was called for a cardiology consultation regarding Decedent's case. (Dkt. 122-19 at ¶ 3; Dkt. 129-2 at ¶ 3). Dr. Kothari was advised that the aortogram had not revealed an aortic dissection. (Dkt. 122-19 at ¶ 4; Dkt. 129-2 at ¶ 4). Dr. Singh, a hospitalist, testified at his deposition that he discussed the case with Dr. Mallavarapu at approximately 10:30 a.m. and was informed that Dr. Mallavarapu had ruled out aortic dissection. (Dkt. 120-17 at ¶ 45; Dkt. 131-2 at ¶ 45).

Dr. Kothari took a history from Decedent and performed a physical examination. (Dkt. 122-19 at ¶ 5; Dkt. 129-2 at ¶ 5). Dr. Kothari considered the possibility of a pulmonary embolism and ordered additional diagnostic testing, including venous Doppler, a D-dimer to evaluate for blood clots, and an echocardiogram. (Dkt. 122-19 at ¶¶ 6-7; Dkt. 129-2 at ¶¶ 6-7). According to the initial radiology report, the venous Doppler was positive for deep vein thrombosis in the left leg. (Dkt. 122-19 at ¶ 9; Dkt. 129-2 at ¶ 23). Decedent also had an elevated D-dimer. (Dkt. 122-19 at ¶ 10; Dkt. 129-2 at ¶ 10). Heparin, an anticoagulant, was administered to treat Decedent's deep vein thrombosis. (Dkt. 122-19 at ¶ 11; Dkt. 129-2 at ¶ 11).

Dr. Kothari and Dr. Singh considered pulmonary embolism in their differential diagnoses, and considered whether to perform a CT scan or a VQ scan to evaluate Decedent's lungs for pulmonary emboli. (Dkt. 122-19 at ¶ 13; Dkt. 129-2 at ¶ 13). They ultimately decided to perform a VQ scan to avoid exposing Decedent to additional contrast

dye, which had been used during the catheterization procedure and is required for a CT scan. (Dkt. 122-19 at ¶ 13; Dkt. 129-2 at ¶ 13).

Dr. Kothari's progress notes indicate that he saw Decedent on the morning of August 5, 2014, and that Decedent reported feeling a little better than the prior day. (Dkt. 122-19 at ¶ 15; Dkt. 129-2 at ¶ 15). Decedent had mild thrombocytopenia (a drop in his platelet count). (Dkt. 120-17 at ¶ 55; Dkt. 122-19 at ¶ 16; Dkt. 119-2 at ¶ 16; Dkt. 131-2 at ¶ 55). Because of the drop in Decedent's platelet count, he was transitioned from Heparin to Xarelto, which is an anticoagulant used to treat deep vein thrombosis. (Dkt. 122-19 at ¶¶ 17-18; Dkt. 129-2 at ¶¶ 17-18). Dr. Kothari signed Decedent off the cardiology service the morning of August 5, 2014. (Dkt. 120-17 at ¶ 56; Dkt. 131-2 at ¶ 56).

Decedent was discharged from OGH on August 5, 2014, by Dr. Singh. (Dkt. 120-17 at ¶ 58; Dkt. 131-2). The discharge diagnosis was: "(1) Chest pain, most probably musculoskeletal[;] (2) Suspected recurrent deep vein thrombosis; (3) hypertension; (4) nicotine dependency; (5) Thrombocytopenia." (Dkt. 120-17 at ¶ 59; Dkt. 131-2 at ¶ 59). Decedent was given a prescription for Xarelto and instructed to follow up with the thrombosis clinic in two to three days. (Dkt. 120-17 at ¶ 60; Dkt. 131-2 at ¶ 60).

Decedent ultimately died on August 8, 2014, approximately three days after he was discharged from OGH. (Dkt. 131-14 at 2). The cause of death was hemopericardium due to or as a consequence of ruptured dissection of the aorta. (*Id.* at 12).

## PROCEDURAL BACKGROUND

Plaintiffs commenced the instant action on July 13, 2016. (Dkt. 1). Plaintiffs filed an Amended Complaint (Dkt. 4) on July 15, 2016, which is the operative pleading. The Amended Complaint names as defendants Dr. Singh, Dr. Mallavarapu, Dr. Kothari, OGH, Olean General Healthcare Systems, LLC ("OGHS"), Dr. Deak, Dr. Buckley, and Exigence. (*Id.* at 1).

OGH and OGHS filed an Answer to the Amended Complaint on August 16, 2016, and also filed cross-claims against all other defendants. (Dkt. 14). Dr. Kothari and Dr. Mallavarapu each filed an Answer to the Amended Complaint on August 17, 2016, and they each further asserted cross-claims against all other defendants. (Dkt. 17; Dkt. 19). Dr. Deak filed an Answer to the Amended Complaint on August 18, 2016. (Dkt. 20). Dr. Singh, Dr. Buckley, and Exigence filed their respective Answers to the Amended Complaint on August 18, 2016, and each asserted cross-claims against all other defendants. (Dkt. 21; Dkt. 22). On September 6, 2016, Dr. Deak filed an Answer to the cross-claims asserted against her and further asserted her own cross-claim against all other defendants. (Dkt. 31). Dr. Buckley and Exigence filed an Amended Answer and amended cross-claims on October 25, 2018. (Dkt. 112). All of the cross-claims in this matter relate to issues of joint liability, indemnification, and/or contribution.

On November 15, 2016, by stipulation of the parties, all of the claims and cross-claims against OGHS were dismissed. (Dkt. 60; Dkt. 61). On September 25, 2018, the parties further stipulated to the dismissal of all of Plaintiffs' direct claims of negligence for affirmative acts by OGH. (Dkt. 110; Dkt. 111).

Discovery in the matter closed on July 30, 2018. (Dkt. 96). The pending motions for summary judgment were filed on October 29, 2018. (Dkt. 119; Dkt. 120; Dkt. 122; Dkt. 123). Opposition papers were filed on October 27, 2018 (Dkt. 129; Dkt. 130; Dkt. 131). Dr. Deak filed reply papers on December 5, 2018 (Dkt. 132; Dkt. 133), Dr. Buckley and Exigence filed reply papers on December 10, 2018 (Dkt. 134), and Dr. Kothari filed reply papers on December 11, 2018 (Dkt. 137). Oral argument was held on June 26, 2019, at which time the Court reserved decision. (Dkt. 140).

## DISCUSSION

## I. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103

(W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.    ELEMENTS OF PLAINTIFFS' CLAIMS

Plaintiffs have asserted claims sounding in medical malpractice and wrongful death. (Dkt. 4 at 10-12). Junger further claims a loss of consortium in her individual capacity. (*Id.* at 13-14).

The Court's jurisdiction over the instant matter is premised on a diversity of citizenship. (*See id.* at 1). Accordingly, the substantive law of New York State governs Plaintiffs' claims. *See Pappas v. Philip Morris, Inc.*, 915 F.3d 889, 893 (2d Cir. 2019) ("[A]s a general matter, a federal district court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits." (emphasis omitted)).

## A.  Medical Malpractice and Wrongful Death Claims

"Under New York law, the essential elements of medical malpractice are (1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury," and "[a] medical malpractice defendant is *prima facie* entitled to summary judgment if it demonstrates that it did not depart from good and accepted medical practice or that any departure did not proximately cause plaintiff's injuries." *Ongley v. St. Lukes Roosevelt Hosp. Ctr.*, 725 F. App'x 44, 46 (2d Cir. 2018) (quotations omitted).  To survive summary judgment, a medical malpractice plaintiff "must present expert testimony" and "the expert's opinion must demonstrate the requisite nexus between the malpractice allegedly committed and the harm suffered." *Id.* at 46-47 (quotations omitted); *see also Doane v. United States*, 369 F. Supp. 3d 422, 446-47 (N.D.N.Y. 2019) ("In order to rebut this showing and survive summary judgment, a plaintiff must submit evidentiary facts or materials, typically through expert testimony, and demonstrate the existence of a triable issue of fact." (quotations omitted)); *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 343 (S.D.N.Y. 2005) ("Expert testimony is normally required to establish the applicable standard of practice and, in an appropriate case, to determine whether an alleged deviation from that standard was the proximate cause of a plaintiff's injuries."). Pursuant to New York law, "[w]hen a wrongful death action is premised on a defendant's alleged medical malpractice, the body of law surrounding medical malpractice and its attendant conclusions applies to the claim of wrongful death." *Coolidge v. United States*, No. 10-CV-363S, 2015 WL 5714237, at *5 (W.D.N.Y. Sept. 29, 2015).

With respect to the first element of a medical malpractice claim under New York law:

> A physician's obligations to his patient are to possess at least the degree of knowledge and skill possessed by the average member of the medical profession in the community in which he practices, to exercise ordinary and reasonable care in the application of that professional knowledge and skill, and to use his best judgment in the application of his knowledge and skill.

*Mann v. United States*, 300 F. Supp. 3d 411, 419 (N.D.N.Y. 2018) (quoting *Sitts v. United States*, 811 F.2d 736, 740 (2d Cir. 1987)).

With respect to the second element, "[a] defendant's negligence qualifies as a proximate cause where it is 'a substantial cause of the events which produced the injury.'" *Id.* (quoting *Mazella v. Beals*, 27 N.Y.3d 694, 706 (2016)). "When a question of proximate cause involves an intervening act, liability turns upon whether the intervening act is a *normal or foreseeable consequence* of the situation created by the defendant's negligence." *Id.* (quotation omitted). The New York Court of Appeals has elaborated on this standard, explaining that "where the acts of a third person intervene between the defendant's conduct and the plaintiff's injury, the causal connection is not automatically severed," and that "the mere fact that other persons share some responsibility for plaintiff's harm does not absolve defendant from liability because there may be more than one proximate cause of an injury." *Hain v. Jamison*, 28 N.Y.3d 524, 529 (2016) (alterations and quotations omitted). On the other hand, "where the intervening act is extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct," it may be sufficient to "break the causal nexus." *Id.* (alterations and quotations omitted).

## B. Loss of Consortium Claims

Junger, in her individual capacity, has brought a claim for loss of consortium against each defendant. "New York common law does not recognize causes of action to recover damages for wrongful death separate from the statutory cause of action accorded to a decedent's distributes," and "[a] surviving spouse, in her individual capacity, does not have a claim for loss of consortium due to her spouse's death." *Mann*, 300 F. Supp. 3d at 421-22. However, a surviving spouse can recover "for loss of consortium for the period prior to the decedent's death, which is a derivative action of the decedent's claim for conscious pain and suffering." *Id.* at 422.

## C. Vicarious Liability Claims

Plaintiffs' claims against Exigence and OGH are based on vicarious liability for the alleged wrongdoing of those entities' employees. "In New York, a malpractice claim against a hospital can rest on vicarious liability for the negligence of a hospital employee who is a defendant in the lawsuit[.]" *Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 137 (2d Cir. 2005); *see also Lorenz v. Managing Dir., St. Luke's Hosp.*, No. 09 Civ. 8898(DAB)(JCF), 2010 WL 4922267, at *11 (S.D.N.Y. Nov. 5, 2010) ("[U]nder New York law, hospitals are vicariously liable for the physicians who provide care to their emergency room patients provided that a patient has not entered the hospital in order to receive treatment from a specific physician."), *report and recommendation adopted*, 2010 WL 4922541 (S.D.N.Y. Dec. 2, 2010).

# III. DR. DEAK'S MOTION FOR SUMMARY JUDGMENT

The Court will address the Moving Defendants' motions for summary judgment in the order that the relevant physician treated Decedent. Accordingly, the Court first considers Dr. Deak's motion for summary judgment.

Dr. Deak contends that she is entitled to summary judgment as to all the claims made against her by any party because she did not deviate from the standard of care and, to the contrary, "started a plan of care that should have resulted in the correct diagnosis of [Decedent's] condition." (Dkt. 120-18 at 11-16). In opposition, Plaintiff argues that Dr. Deak did deviate from the standard of care, because: (1) she did not order a "STAT CT angiography of the chest," which is "the gold standard for both aortic dissection and pulmonary embolism"; and (2) she failed to fully inform Dr. Buckley of all pertinent findings and symptoms when she signed Decedent off to his care, including the fact that pain was radiating to Decedent's back and down his right leg, and failed to recommend a CT scan to Dr. Buckley. (Dkt. 131-1 at 5, 16-18). Plaintiffs further argue that Dr. Deak's deviations were a proximate cause of Decedent's death, because had the aortic dissection been discovered at any point prior to his death, it could have been surgically repaired with an average 85 to 90 percent survival rate. (*Id.* at 18).

## A. Compliance with Local Rules of Civil Procedure

As a threshold matter, Plaintiffs argue that Dr. Deak's motion should be denied because she "failed to cite to the admissible evidence with the specificity required by Local Rule 56(1). . . ." (Dkt. 131-1 at 18). The Court rejects this argument.

Local Rule of Civil Procedure 56(a)(1) requires a party moving for summary judgment to submit a "separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L. R. Civ. P. 56(a)(1). Local Rule 56(a)(1) further provides that each numbered paragraph "must be followed by citation to admissible evidence or to evidence that can be presented in admissible form at trial," and that such citations "shall identify with specificity the relevant page and paragraph or line number of the evidence cited." *Id.*

In this case, although there are a few paragraphs of Dr. Deak's Statement of Undisputed Material Facts that cite generally to the medical records from OGH without providing page numbers (*see, e.g.,* Dkt. 120-17 at ¶¶ 1-2, 10), Dr. Deak has substantially complied with the requirements of Local Rule 56(a)(1). District courts have the authority to excuse noncompliance with their Local Rules. *See Wight v. BankAmerica Corp.*, 219 F.3d 79, 85-86 (2d Cir. 2000). While it would have been better practice for Dr. Deak to consistently cite to the specific page of the medical records upon which she relied, the Court does not find this minor deviation from the requirements of Local Rule 56(a)(1) sufficient to warrant a denial of Dr. Deak's motion.

## B.     Proximate Cause

Turning to the merits of Plaintiffs' claims against Dr. Deak, the Court finds that Dr. Deak is entitled to summary judgment because, regardless of whether Dr. Deak deviated from the standard of care, Dr. Mallavarapu's failure to identify the aortic dissection upon review of the aortogram is an intervening act that broke any causal nexus between Dr. Deak's alleged wrongdoing and Decedent's death.

Under New York law, "[i]f the negligent act of the third party is extraordinary under the circumstances and unforeseeable as a normal and probable consequence of defendant's negligence, then the third party's negligence supersedes that of the defendant and relieves defendant of liability." *DePesa v. Westchester Square Med. Ctr.*, 239 A.D.2d 287, 288 (1st Dep't 1997). "When a question of proximate cause involves an intervening act, liability turns upon whether the intervening act is a *normal or foreseeable consequence* of the situation created by the defendant's negligence." *Mann*, 300 F. Supp. 3d at 420 (quotation omitted). "[P]roximate cause will be found lacking where the original negligent act merely furnished the occasion for—but did not cause—an unrelated act to cause injuries not ordinarily anticipated." *Hain*, 28 N.Y.3d at 530 (internal quotations omitted).

"[T]he issue of whether a doctor's negligence is more likely than not a proximate cause of a plaintiff's injury is usually for the jury to decide." *Tarqui v. United States*, No. 14-CV-3523 (KMK), 2017 WL 4326542, at *7 (S.D.N.Y. Sept. 27, 2017) (quotation omitted). However, summary judgment in favor of a medical malpractice defendant is appropriate where the record conclusively demonstrates there has been "a superseding act which broke the causal nexus." *Wilkins v. Khoury*, 72 A.D.3d 1067, 1068 (2d Dep't 2010); *cf. Allen v. Antal*, 665 F. App'x 9, 15 (2d Cir. 2016) (explaining, in context of claim for attorney malpractice, that "[s]ummary judgment is appropriate where the record demonstrates that an intervening cause was responsible for the injury." (quotation omitted)).

Here, assuming without deciding that there are issues of fact as to whether Dr. Deak deviated from the standard of care, it is undisputed on the record before the Court that an

aortogram was ultimately performed and that the aortogram revealed the presence of an aortic dissection. As such, and as Dr. Deak has argued, the treatment plan she initiated resulted in the performance of medical imaging that revealed the aortic dissection. In other words, under normal circumstances, Dr. Deak's actions would have resulted in Decedent being diagnosed with an aortic dissection and receiving the treatment he needed, regardless of any alleged negligence on her part.

Dr. Deak cannot reasonably have been expected to foresee that Dr. Mallavarapu, a trained cardiologist, would fail to appreciate the presence of an aortic dissection on an aortogram, nor was this intervening act by Dr. Mallavarapu a normal and probable consequence of Dr. Deak's actions. *See, e.g., Pierre v. Lieber*, 37 A.D.3d 572, 573 (2d Dep't 2007) (finding that physician's failure to diagnose gestational diabetes was not proximate cause of plaintiff's injuries where "the actions taken by the other defendants in an attempt to alleviate [fetal] distress were independent and far removed from the appellant's conduct, and were thus superseding acts which broke the causal nexus"); *Brocco v. Westchester Radiological Assocs., P.C.*, 175 A.D.2d 903, 904-05 (2d Dep't 1991) (finding that alleged failure to accurately interpret CAT scan was not a proximate cause of the decedent's injury or death where two other physicians subsequently accurately diagnosed the plaintiff's condition). Dr. Mallavarapu's failure to identify the aortic dissection on the aortogram is the sort of extraordinary and unforeseeable superseding event that breaks any causal chain and relieves Dr. Deak of liability.

The Court is not persuaded by Plaintiffs' argument that proximate cause can be shown here because Decedent's aortic dissection could have been surgically repaired up to

the point it caused his death. Absent Dr. Mallavarapu's intervening failure to appropriately interpret the aortogram, Dr. Deak's alleged deviations from the standard of care might have delayed the diagnosis of the fatal aortic dissection, but they would not have delayed it past the point that surgery could have been performed. There is no evidence before the Court to suggest that, had Dr. Mallavarapu discovered the aortic dissection when he performed the aortogram, surgery could not have been successfully undertaken. To the contrary, Plaintiffs' own expert has testified that "[h]ad the dissection been diagnosed at any time while [the Decedent] was a patient at Olean General Hospital, . . . a cardiothoracic surgeon could have successfully repaired the dissection, with a very high success rate." (Dkt. 120-5 at 24) (emphasis added).

For all these reasons, the Court finds that, on the record before it, no reasonable jury could conclude that Dr. Deak's alleged negligence proximately caused Decedent's injuries and death. The Court therefore finds that Dr. Deak is entitled to summary judgment in her favor as to Plaintiffs' wrongful death and medical malpractice claims.

## C.     Cross-Claims and Loss of Consortium Claims

As noted above, several other defendants in this case have asserted cross-claims against Dr. Deak sounding in joint liability, indemnification, and/or contribution. These cross-claims are contingent on Dr. Deak being liable to Plaintiffs in the first instance. *See, e.g., Klein v. City & Cty. Paving Corp.*, No. 16 Civ. 2264 (NRB), 2018 WL 4265885, at *7 (S.D.N.Y. Sept. 5, 2018) (finding the validity of cross-claims for contribution and indemnification moot upon grant of summary judgment in favor of defendants against whom they were asserted). Similarly, "loss of consortium is a derivative claim that does

not exist separate and apart from the injured spouse's claim." *Jack v. Orkin Exterminating Co.*, No. 97-CV-7012 (JG), 2001 WL 25641, at *6 (E.D.N.Y. Jan. 5, 2001). Accordingly, the Court's finding that Plaintiffs cannot maintain a medical malpractice or wrongful death claim against Dr. Deak necessarily means that Dr. Deak is entitled to summary judgment on all cross-claims against her and on Junger's loss of consortium claim.

## IV. DR. BUCKLEY'S AND EXIGENCE'S MOTION FOR SUMMARY JUDGMENT

The Court next considers Dr. Buckley's and Exigence's motion for summary judgment. As previously noted, Dr. Buckley was employed by Exigence at the time he treated Decedent, which is the basis for Plaintiffs' claims against Exigence. (*See* Dkt. 119-2 at ¶ 4). As such, Plaintiffs' claims against Exigence rise or fall with their claims against Dr. Buckley.

Dr. Buckley and Exigence contend that Dr. Buckley did not deviate from the standard of care in treating Decedent and that no act or omission by Dr. Buckley caused Decedent's injuries. (Dkt. 119-12 at 10-12). In opposition, Plaintiffs argue that Dr. Buckley deviated from the standard of care because he: (1) failed to elicit Decedent's radiating pain; (2) failed to consider aortic dissection higher up in his differential diagnosis; (3) failed to order a CT scan; and (4) failed to tell Dr. Mallavarapu that aortic dissection was in his differential diagnosis. (Dkt. 130-1 at 5).

### A. Compliance with Local Rules of Civil Procedure

Plaintiffs make the same argument regarding an alleged failure to comply with Local Rule 56(a)(1) with respect to Dr. Buckley's and Exigence's motion as they did with

respect to Dr. Deak's motion. (Dkt. 130-1 at 17). Unlike Dr. Deak, Dr. Buckley and Exigence have failed entirely to comply with Local Rule 56(a)(1)'s requirement that citations in the Statement of Undisputed Material Facts included page, paragraph, or line references. (*See* Dkt. 119-2). Counsel for Dr. Buckley and Exigence are reminded of the importance of being familiar and complying with the Court's Local Rules. However, mindful that courts in this Circuit have a "long-established preference for deciding cases on their merits," *Malcolm v. Honeoye Falls-Lima Educ. Ass'n*, 678 F. Supp. 2d 100, 104 (W.D.N.Y. 2010), the Court will excuse the failure to comply with Local Rule 56(a)(1) in this instance.

### B. Proximate Cause

For the same reasons as discussed above with respect to Dr. Deak, the Court finds that no reasonable jury could conclude that any alleged deviation by Dr. Buckley proximately caused Decedent's injuries and death. Like Dr. Deak, Dr. Buckley took actions that resulted in Dr. Mallavarapu performing an aortogram that revealed the fatal aortic dissection. Dr. Buckley did not cause and could not have anticipated Dr. Mallavarapu's failure to discern the aortic dissection when he reviewed the results of the aortogram. As such, this superseding and unforeseeable act by Dr. Mallavarapu broke the causal nexus between Dr. Buckley's actions and Decedent's death, and no reasonable jury could conclude otherwise.

### C. Cross-Claims and Loss of Consortium Claims

For the same reasons discussed above with respect to Dr. Deak's summary judgment motion, the Court's finding in Dr. Buckley's favor as to Plaintiffs' wrongful death and

medical malpractice claims necessarily resolves Junger's loss of consortium claims as well as all cross-claims against Dr. Buckley and Exigence. The Court therefore grants summary judgment to Dr. Buckley and Exigence on such claims and cross-claims.

## V.  DR. KOTHARI'S MOTION FOR SUMMARY JUDGMENT

The Court next considers Dr. Kothari's motion for summary judgment. Dr. Kothari contends that he is entitled to summary judgment because Plaintiffs' expert Dr. Jon Resar is unqualified to render opinions regarding Dr. Kothari's care and because Dr. Resar's opinions are unsupported by the facts in the record or have been recanted by Dr. Resar. (Dkt. 137-10 at 4). In opposition, Plaintiffs argue that Dr. Resar is qualified as an expert witness and that his report is reliable and relevant. (Dkt. 129-1 at 18-26).

### A.  Evaluation of Expert Testimony

Pursuant to Federal Rule of Evidence 702, a proposed expert witness must possess "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In accordance with this rule, a court considering the admissibility of expert testimony must consider whether (1) "the testimony is based on sufficient facts or data"; (2) "the testimony is the product of reliable principles and methods"; and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (c), (d).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court explained that a trial court has a "gatekeeping" duty under Rule 702, and must make sure that proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S.

137, 147 (1999) ("In *Daubert*, this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but reliable." (quotation and alteration omitted)).

"Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). "Ultimately, the party proffering the expert has the burden to demonstrate by a preponderance of the evidence that its expert witness satisfies these criteria." *Id.* (quotation and alteration omitted). "As the courts and Advisory Committee have made clear, 'the rejection of expert testimony is the exception rather than the rule.'" *M.B. ex rel. Scott v. CSX Transp., Inc.*, 130 F. Supp. 3d 654, 665 (N.D.N.Y. 2015) (quoting Fed. R. Evid. 702, Advisory Committee's Note).

## B.    Dr. Resar's Testimony is Admissible

Dr. Resar is a board-certified interventional cardiologist and, among other appointments, is the director of the Adult Cardiac Catheterization Laboratory at Johns Hopkins Hospital in Baltimore, Maryland. (Dkt. 122-8 at 4). Dr. Resar submitted an expert report in which he offered, among others, the following opinions: (1) Dr. Kothari failed to order a CT angiography or take any other steps to rule out aortic dissection and misread the echocardiogram, which was "concerning for aortic dissection on run 64"; (2) Dr. Kothari's reasons for failing to perform CT angiography were not valid, because Decedent had "a markedly elevated D-dimer and a VQ scan that ruled out pulmonary embolism,"

such that "the standard of care demanded CT angiography of the chest"; and (3) Dr. Kothari's decision to prescribe Xarelto was a deviation from the standard of care, because he failed to take into account changes in Decedent's hemoglobin, hematocrit, and platelet counts. (*Id*. at 19-23).

Dr. Kothari objects to the admissibility of Dr. Resar's expert opinions on several bases. Initially, Dr. Kothari contends that because Dr. Resar is an interventional cardiologist and Dr. Kothari is a clinical or "non-invasive" cardiologist, Dr. Resar is not qualified to testify regarding the care provided by Dr. Kothari. (Dkt. 122-20 at 14-15). Dr. Kothari particularly contends that Dr. Resar is unqualified to evaluate echocardiography. (*Id*. at 15). This argument lacks merit.

"A physician need not be a specialist in a particular field in order to qualify as a medical expert." *Lyons v. Robinson*, 242 F.3d 366, 2000 WL 1811012, at *1 (2d Cir. 2000) (table decision). Instead, the relevant question is "whether the party seeking to introduce the expert testimony has demonstrated that the expert has the relevant 'knowledge, skill, experience, training or education.'" *Id*. (quoting Fed. R. Evid. 703). Dr. Resar has submitted a declaration explaining that he practices general cardiology on a routine basis and interprets and uses echocardiography in his daily practice. (Dkt. 129-3 at 2). Dr. Resar also confirms that he has previously been qualified to serve as an expert witness regarding the actions of a non-invasive cardiologist. (*Id*.). Dr. Resar states that it is "part of [his] bailiwick as being a cardiologist" to "comment on interpretation of echocardiograms that are used in the evaluation and management of patients." (*Id*. at 4). This is sufficient, "under the liberal standard of Rule 702," to establish that Dr. Resar is qualified to opine on

the care rendered by Dr. Kothari. *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 671 (E.D.N.Y. 2013) (rejecting argument that board-certified pathologist was unqualified to opine on cause of death because he had not performed an autopsy on an individual following the use of an electronic weapon).

Dr. Kothari next argues that Dr. Resar's expert report is unreliable and irrelevant. In support of this argument, he makes the following contentions: (1) Dr. Resar is incorrect that Dr. Kothari misread the echocardiogram, because during his deposition he was unable to "point to anything concerning" about run 64; (2) Dr. Resar "recanted" his opinion that Dr. Kothari should have ordered a CT scan, because he testified that it would have been of "limited benefit" for a patient with Decedent's signs and symptoms; and (3) Dr. Resar's opinion that a CT scan should have been ordered otherwise is unsupported by the facts in the record. (Dkt. 122-20 at 16- 23). The Court is not persuaded by these arguments.

Initially, the Court notes that while Dr. Resar did indeed state at his deposition that run 64 was not the run that he found most concerning and that he was not sure it was the run he meant to reference in his expert report, he went on to identify several other abnormalities in the echocardiogram. (*See* Dkt. 129-4 at 60). The Court is not persuaded by Dr. Kothari's contention that these other abnormalities are outside the scope of Dr. Resar's expert report. Dr. Resar's report states that the echocardiogram showed that the ascending aorta was dilated and "abnormal." (*See* Dkt. 122-8 at 17, 20). This is consistent with Dr. Resar's deposition testimony, where he noted several instances on the echocardiogram showing dilation of the aorta. (*See* Dkt. 129-4 at 60). The apparently erroneous reference to run 64 in Dr. Resar's expert report, while fair ground for cross-

examination, does not change the fact that he opined more generally that the echocardiogram showed an abnormal, dilated ascending aorta.

The Court further agrees with Plaintiffs that Dr. Kothari's contention that Dr. Resar "recanted" his opinion regarding the CT scan lacks merit. At his deposition, Dr. Resar, in response to a hypothetical question, stated that a CT scan would have been of limited benefit under the identified circumstances except for the existence of the echocardiogram. (Dkt. 129-4 at 57). Dr. Kothari, relying on his contention that Dr. Resar could not identify anything concerning on run 64 of the echocardiogram, extrapolates this to mean that a CT scan was not required. However, as the Court has already found, Dr. Resar has continued to maintain that there were abnormalities on the echocardiogram that Dr. Kothari should have identified. It is not a reasonable conclusion that Dr. Resar "recanted" his testimony in this regard.

Finally, with respect to Dr. Kothari's argument that Dr. Resar's factual assumptions are inaccurate, "[u]nless the information or assumptions that plaintiff's expert relied on were so unrealistic and contradictory as to suggest bad faith, inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 306 (S.D.N.Y. 2015) (quotations and original alterations omitted). Instead, such inaccuracies typically go to the weight, and not the admissibility, of the opinions. *Id.* In this case, while Dr. Kothari has established the existence of alternative factual scenarios, nothing in the record suggests bad faith on the part of Dr. Resar, and the allegedly faulty assumptions go to the weight, and not the admissibility, of Dr. Resar's opinions. As such, the Court does not find Dr. Resar's expert

opinions inadmissible.

## C.    <u>Request for Summary Judgment</u>

Dr. Kothari contends that he is entitled to summary judgment on Plaintiffs' medical malpractice and wrongful death claims because such claims must be established by expert testimony, and Dr. Resar's expert opinions are inadmissible. (Dkt. 122-20 at 26). The Court rejects this argument, because it has found Dr. Resar's expert opinions admissible for the reasons set forth above. Moreover, Dr. Kothari's moving papers do not discuss Junger's loss of consortium claim, and Dr. Kothari therefore has not established his entitlement to summary judgment on that claim.

## VI.    OGH'S MOTION FOR SUMMARY JUDGMENT

As noted above, the only claims remaining against OGH in this action are vicarious liability claims based on the actions of its employees. OGH has filed a motion for summary judgment that does not raise any substantive arguments, but instead contends that to the extent any of the named co-defendants are granted summary judgment, OGH should also be granted summary judgment on those claims. (Dkt. 123). Plaintiffs have not filed any opposition to OGH's motion.

For all the reasons discussed above, the Court has found that summary judgment is appropriate as to all of Plaintiffs' claims against Dr. Deak, Dr. Buckley, and Exigence. To the extent they are asserted against OGH, the Court also grants OGH's motion for summary judgment as to those claims.

## **CONCLUSION**

For the reasons set forth below, the Court grants Dr. Buckley's and Exigence's motion for summary judgment (Dkt. 119), grants Dr. Deak's motion for summary judgment (Dkt. 120), denies Dr. Kothari's motion for summary judgment (Dkt. 122), and grants in part and denies in part OGH's motion for summary judgment (Dkt. 123). The Clerk of Court is directed to terminate Dr. Buckley, Exigence, and Dr. Deak as defendants and to enter judgment in their favor.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: August 8, 2019
      Rochester, New York