UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KATHRYN JUNGER and ROBERT F.
DANZI, *as co-administrators of the estate*
*of George Edward Johnson, deceased*, and
KATHRYN JUNGER, *individually*,

               Plaintiffs,

     v.

HARPREET SINGH, M.D., and
ASHOKKUMAR J. KOTHARI, M.D.,

             Defendants.
_____

**DECISION AND ORDER**


1:16-CV-00564 EAW


## INTRODUCTION

Plaintiffs Kathryn Junger ("Junger") and Robert Danzi, the co-administrators of the estate of George Edward Johnson ("Johnson" or "Decedent"), commenced the instant action on July 13, 2016, on behalf of Johnson's estate and Junger individually[1]. (Dkt. 1). In the Amended Complaint, which is the operative pleading, Plaintiffs assert claims against defendants Dr. Harpreet Singh ("Dr. Singh") and Dr. Ashokkumar J. Kothari ("Dr. Kothari") (collectively "Defendants") sounding in medical malpractice and wrongful death. (Dkt. 4).[2] Junger also asserts loss of consortium claims in her individual capacity. (*Id.*).

---

[1]    Junger is Johnson's widow and the co-administrator of his estate.

[2]    The Amended Complaint also asserted claims based on lack of informed consent, but Plaintiffs voluntarily dismissed those claims. (*See* Dkt. 143).

Currently pending before the Court are seven motions in limine related to the jury trial originally scheduled to commence on May 11, 2020, and subsequently adjourned without date.  (Dkt. 167; Dkt. 168; Dkt. 169; Dkt. 170; Dkt. 176; Dkt. 184).  The Court's resolution of these motions is set forth below.

## FACTUAL BACKGROUND

The factual background of this matter is set forth in detail in the Court's Decision and Order dated August 8, 2019 (Dkt. 144), familiarity with which is assumed for purposes of the instant Decision and Order.  To briefly summarize, on August 4, 2014, Decedent was taken by ambulance to Olean General Hospital ("OGH") complaining of chest pain and nausea.  (*Id.* at 2-3).  Decedent was treated in the emergency room by Dr. Teresa M. Deak ("Dr. Deak") and Dr. Robert S. Buckley ("Dr. Buckley").  (*Id.* at 3-4).  Dr. Buckley requested a consultation with interventional cardiologist Dr. Christopher T. Mallavarapu ("Dr. Mallavarapu"), who performed a cardiac catheterization on Decedent, including an aortogram.  (*Id.* at 5).  At the time he performed the aortogram, Dr. Mallavarapu did not observe an aortic dissection.  (*Id.*).  However, Dr. Mallavarapu subsequently acknowledged that the aortogram was indicative of an aortic dissection.  (*Id.* at 5-6).

Dr. Kothari was called for a cardiology consultation regarding Decedent's case after the cardiac catheterization and was informed that the aortogram had not revealed an aortic dissection.  (*Id.* at 6).  Dr. Kothari treated Decedent on both August 4, 2014, and August 5, 2014.  (*Id.* at 6-7).  Dr. Kothari signed Decedent off cardiology service on the morning of August 5, 2014.  (*Id.* at 7).  Dr. Singh, a hospitalist, discharged Decedent from OGH that same day.  (*Id.*).  On August 8, 2014, Decedent died due to hemopericardium due to or as

- 2 -

a consequence of ruptured dissection of the aorta.  (*Id.*).

## PROCEDURAL BACKGROUND

Plaintiffs commenced the instant action on July 13, 2016.  (Dkt. 1).  Plaintiffs filed an Amended Complaint (Dkt. 4) on July 15, 2016, which is the operative pleading.  The Amended Complaint names as defendants Dr. Singh and Dr. Kothari, as well as OGH, Olean General Healthcare Systems LLC ("OGHS"), Dr. Deak,  Dr. Buckley, Exigence Medical of Olean PLLC ("Exigence"), and Dr. Mallavarapu.  (*Id.* at 1).   OGHS was discontinued as a defendant via stipulation on November 15, 2016.  (Dkt. 60; Dkt. 61).

Discovery in the matter closed on July 30, 2018.  (Dkt. 96).  On October 29, 2018, Dr. Deak, Dr. Buckley, Exigence, Dr. Kothari, and OGH filed motions for summary judgment.  (Dkt. 119; Dkt. 120; Dkt. 122; Dkt. 123).  The Court entered a Decision and Order on August 8, 2019, granting Dr. Deak's, Dr. Buckley's, and Exigence's motions for summary judgment, granting in part and denying in part OGH's motion for summary judgment, and denying Dr. Kothari's motion for summary judgment.  (Dkt. 144).

On September 4, 2019, the Court entered a pretrial order that, among other things, scheduled a jury trial to commence on May 11, 2020, and ordered the filing of motions in limine by April 1, 2020.  (Dkt. 151).

On December 16, 2019, Plaintiffs sent the Court a letter indicating that they had settled their claims against Dr. Mallavarapu.  (Dkt. 152).  Dr. Mallavarapu and OGH were subsequently terminated as defendants in this matter via stipulation.  (Dkt. 159; Dkt. 160; Dkt. 161; Dkt. 162).

On April 1, 2020, the parties filed, among other pretrial filings, the following motions in limine: (1) a motion by Dr. Kothari to preclude testimony by Plaintiffs' expert economist, Edmund H. Mantell, Ph.D. ("Dr. Mantell") (Dkt. 167); (2) a motion by Plaintiffs to disqualify Dr. Kothari's accounting expert, Michael Carnegie (Dkt. 168); (3) a motion by Plaintiffs to preclude Dr. Nishith Amin, Dr. Singh's expert interventional cardiologist, from providing opinion testimony as to deviation from good and accepted medical practice on the part of Dr. Mallavarapu or any other defendant or former defendant (Dkt. 169); (4) a motion by Plaintiffs to preclude Dr. Judy Ann Joy-Pardi, Dr. Kothari's expert non-interventional cardiologist, from providing opinion testimony as to deviation from good and accepted medical practice on the part of Dr. Mallavarapu or any other defendant or former defendant  (Dkt. 170); (5) a motion by Plaintiffs to preclude cross-examination of Dr. Mantell on prior judicial criticism (Dkt. 172); and (6) a motion by Dr. Singh to strike Dr. Mantell's expert opinions (Dkt. 176).

Dr. Singh moved to adjourn the scheduled trial due to the ongoing COVID-19 pandemic on April 3, 2020.  (Dkt. 178).  The Court granted the motion and adjourned the trial without date on April 6, 2020, but kept in place the filing deadlines set forth in the Pretrial Order.  (Dkt. 181).

On April 9 and 10, 2020, the parties filed response papers, and Dr. Singh filed a cross-motion to preclude Plaintiffs from offering evidence that Dr. Mallavarapu did not commit malpractice in his treatment of Decedent.  (Dkt. 182; Dkt. 183; Dkt. 184).  Replies and Plaintiffs' response to Dr. Singh's cross-motion were filed on April 14 and 15, 2020. (Dkt. 185; Dkt. 186; Dkt. 187; Dkt. 188; Dkt. 190; Dkt. 194).

On April 15, 2020, Dr. Singh also filed objections to the portions of Plaintiffs' trial memorandum indicating that they: (1) intend to introduce deposition testimony of Dr. Deak, Dr. Buckley, and Dr. Mallavarapu at trial; (2) intend to introduce portions of the deposition testimony of Dr. Mallavarapu's expert, Dr. Philip B. Duncan, at trial; and (3) intend to call Dr. Singh's expert economist, Matthew McCabe, in presenting their direct case.  (Dkt. 195).  Plaintiffs filed a reply to Dr. Singh's objections later that same day. (Dkt. 199).

The Court held oral argument on the pending motions in limine on June 12, 2020, continuing on June 18, 2020, and reserved decision.  (Dkt. 207; Dkt. 209).

## DISCUSSION

### I.   Motions Related to Dr. Mantell's Testimony

Defendants have both filed motions *in limine* to preclude Dr. Mantell, Plaintiffs' expert economist, from testifying at trial.  (*See* Dkt. 167; Dkt. 176).  Plaintiffs have also filed a motion *in limine* regarding Dr. Mantell's testimony, requesting that the Court preclude Defendants from cross-examining Dr. Mantell regarding judicial criticism he received for testimony he provided in 1984 and 1991.  (Dkt. 172).

#### A.   Defendants' Motions to Preclude Testimony by Dr. Mantell

Defendants move to preclude Dr. Mantell's testimony because it "relies on hearsay, is based on unsupportable assertions and assumptions, ignores relevant evidence, and is the product of a flawed analysis."  (*See* Dkt. 176 at 8; *see also* Dkt. 167 at 2 ("Dr. Mantell's testimony would be speculative and without foundation.")).  Dr. Kothari has also argued,

in the alternative, that Dr. Mantell's testimony should be limited to the scope of his original report.  (*See* Dkt. 167 at 2).

### 1.      Admissibility of Dr. Mantell's Testimony

Defendants challenge the following specific "unsupported assumptions" upon which Dr. Mantell's testimony is allegedly based: (1) Decedent would have resumed his full-time legal practice effective September 2016, until age 75; (2) Decedent's gross professional revenues in 2017 would have been equal to his gross professional revenues in 2007; and (3) Decedent would have rendered his customary household services for a weekly average of 16 hours for every year from 2017 until age 82.2.  (*See* Dkt. 176 at 10-11).   Defendants contend that these assumptions are hearsay, "based primarily on the conclusory and self-serving assertions of the decedent's wife, have no basis in fact and are therefore unreliable.  Further, they are not supported by published statistical data regarding those projections, which would be the assumptions that experts such as Dr. Mantell would otherwise rely on."  (*Id*. at 11).  For example, Defendants contend that Plaintiffs' counsel instructed Dr. Mantell to assume that Decedent would work until age 75, rather than the age specified by the statistical tables, which is younger.  (*Id*. at 11-12).  Dr. Mantell also acknowledged that although the statistical tables take into account a person's physical condition, he was instructed to disregard the tables.  (*Id*. at 11).  Further, Defendants argue that Dr. Mantell "conducted no independent analysis of what other lawyers in the town where the decedent worked were making, what their average income was, what the decedent's hourly rate was in 2007, or what the decedent's hourly rate was going to be in 2017," but rather assumed that Decedent's gross professional revenues in 2017 would have

been equal to his gross professional revenues in 2007. (*Id*. at 12). Finally, Defendants argue that, based on information given to him by Plaintiffs' counsel, Dr. Mantell improperly assumed that Decedent would have rendered his customary services on an average of 16 hours per week, from 2017 until age 82.2. (*Id*.). Defendants note that at his deposition, Dr. Mantell admitted that he made "some assumptions which I stand behind because I made those assumptions, I professionally endorse them. There are other assumptions which I've been instructed to make which I do not stand behind." (*Id*.). Defendants conclude that "Dr. Mantell's blind reliance upon the representations of the decedent's wife and plaintiffs' counsel are reason enough to strike his opinion." (*Id*.).

In response, Plaintiffs contend that Dr. Mantell's assumptions were reasonable and that he reached "virtually the same economic projections on a per year basis" as Dr. Singh's consultant, Matthew McCabe. (Dkt. 182). Plaintiffs argue that: Junger provided information that Decedent intended to work until age 75; Decedent intended to resume his fulltime law practice in 2017, and so using his gross income in 2007, when he last worked fulltime, was therefore a reliable and even a conservative estimate, given that Dr. Mantell did not make an adjustment for inflation; and Mr. McCabe used almost identical numbers to those used by Dr. Mantell for the value of Decedent's provision of household services up until age 82.2. (*Id*. at 2-3).

Pursuant to Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

- 7 -

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

*See* Fed. R. Evid. 702. "As the Second Circuit has noted, district courts should presume expert evidence is reliable." *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 456 (E.D.N.Y. 2007). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court explained that a trial court has a "gatekeeping" duty under Rule 702, and must make sure that proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) ("In *Daubert*, this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but reliable.") (quotation and alteration omitted).

"Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *Washington v. Kellwood Co*., 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). "Ultimately, the party proffering the expert has the burden to demonstrate by a preponderance of the evidence that its expert witness satisfies these criteria." *Id.* (quotation and alteration omitted). "As the courts and Advisory Committee have made clear, 'the rejection of expert testimony is the exception rather than the rule.'"

*M.B. ex rel. Scott v. CSX Transp., Inc*., 130 F. Supp. 3d 654, 665 (N.D.N.Y. 2015) (quoting Fed. R. Evid. 702, Advisory Committee's Note).

"Disputes as to the strength of an expert's credentials, faults in the use of a methodology, or lack of textual authority for an opinion go to 'the weight, and not the admissibility' of an expert's testimony." *United States v. American Exp. Co*., No. 10-CV-4496(NGG)(RER), 2014 WL 2879811, at *2 (E.D.N.Y. June 24, 2014). Further, "[a]rguments about the assumptions and data underlying an expert's testimony go to the weight, rather than the admissibility, of that testimony." *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936(KMW), 2011 WL 1674796, at *7 (S.D.N.Y. May 2, 2001). "Unless the information or assumptions that plaintiff's expert [ ] relied on were 'so unrealistic and contradictory as to suggest bad faith,' inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible." *Washington v. Kellwood Co*., 105 F. Supp. 3d 293, 306 (S.D.N.Y. 2015) (quoting *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010)) (alteration in original). "Expert testimony should not be rejected simply because the conclusions reached by the witness seem subjectively improbable. . . . It is [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof [that] are the traditional and appropriate means of attacking shaky but admissible evidence." *Id*. at 306-07 (internal quotations and citations omitted) (alteration in original). However, "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc*., 451 F.3d 104, 127 (2d Cir. 2006), *aff'd*, 552 U.S. 312 (2008).

In this case, while Dr. Mantell employed certain assumptions in making his findings regarding the damages calculation, he also based his calculations on Decedent's business earnings from tax filings. (*See* Dkt. 182-2 at 6). Dr. Mantell also relied on the "Life Tables, Canada Provinces and Territories, 2009 to 2011," to determine Decedent's life expectancy. (*Id.* at 9). Accordingly, the Court cannot conclude that his opinions are without evidentiary foundation.

As to the assumptions challenged by Defendants, Dr. Mantell explained both in his deposition and in his expert report how he arrived at his conclusions regarding Decedent's lost earnings. Some of Dr. Mantell's calculations were based on information he had obtained from Decedent's wife regarding their future plans. (*See, e.g.*, Dkt. 182-12 (Junger's testimony that her husband planned to return to full-time law practice in 2016); *see also* Dkt. 182-2 at 6 ("In 2008 the decedent and his wife agreed that the decedent would reduce the time he allocated to his professional practice in order to allocate more time to the care of their children and their household when the care giver was unavailable.")). Further, the assumption that Decedent would have worked until 75 years old was based on discussions that Junger and Decedent had regarding how long he would work (Dkt. 182-4 at 9), as well as demographic trends released by the Canadian Bar Association that the "average retirement age for the occupational group is around 75" (*see* Dkt. 182-11). At his deposition, Dr. Mantell explained that assumptions regarding how long an individual will remain on the workforce may be based on information contained in a statistical table, and other times it is based on information obtained from family members; Dr. Mantell testified that he uses "whichever seems to me to be a more reliable guide," and that he used Junger's

estimate in this case because it was more reliable, as she knew Decedent intimately.  (*See* Dkt. 182-4 at 7-11).  In other words, it is not as if Dr. Mantell conjured these numbers out of thin air.  *See MacQuesten Gen. Contracting, Inc. v. HCE, Inc*., No. 99 Civ. 8598(JCF), 2002 WL 31388716, at *2 (S.D.N.Y. Oct. 22, 2002) ("In this case, [the plaintiff] attacks the factual underpinnings of the opinions offered by [the defendant's] experts.  In part, the plaintiff complains that the experts have founded their opinions on hearsay.  But expert analysis is often based on reported information rather than firsthand knowledge, and that is no bar to its admissibility. . . .  Moreover, a claim that the assumptions relied on by an expert are unfounded is generally an argument that goes to the weight rather than the admissibility of the evidence.").  Defendants' criticisms of Dr. Mantell's methodologies or the assumptions he employed in making his calculations may be leveled during cross-examination, but the Court will not preclude Dr. Mantell from testifying as an expert witness.  Defendants' motions seeking this relief are denied.

### 2.   The Scope of Dr. Mantell's Testimony

Having determined that Dr. Mantell's testimony should not be excluded in its entirety, the Court addresses whether his testimony must be limited to the scope of his original report, rather than including information contained in the supplementary reports served by Plaintiffs one day before pre-trial disclosures were due, on March 31, 2020.  (*See* Dkt. 167 at 2).  Dr. Kothari contends that the supplementary reports contain "an analysis of taxation that did not appear in Dr. Mantell's prior reports," and that if Plaintiffs are permitted to offer this testimony at trial, Defendants will have been deprived of the right to question Dr. Mantell as to whether he was qualified to offer an opinion on this subject.

In response, Plaintiffs contend that the supplementary reports were timely under Federal Rule of Civil Procedure 26(e)(2).  (Dkt. 182 at 16).  Specifically, Plaintiffs argue that the supplementary reports were disclosed before the deadline for pre-trial disclosures, are ministerial mathematical calculations, and offer no new opinions.  (*Id*. at 16-17).

The Court has reviewed the supplementary disclosures, which are attached as Exhibit L to Plaintiffs' response papers.  (*See* Dkt. 182-13).  The supplementary disclosures state that they contain the following information:

> 1.      Supplementary Report dated May 26, 2016, which was marked as Exhibit 2-A at the deposition of Edmond Mantell, Ph.D. on January 22, 2018 (and included in Exhibit 2 of same date).  This report contained the reduction to present value of plaintiffs' economic loss stated in his Report dated May 26, 2016.
>
> 2.      Amended Economic Report dated March 28, 2020.  This amended report updates plaintiffs' economic losses as previously stated in Dr. Mantell's Report dated May 26, 2016, and calculates the effect of taxes thereon.
>
> 3.      Amended Supplementary Economic Report dated March 28, 2020. This amended supplement reduces the Amended Economic Report dated March 28, 2020 to present value.

(*Id*. at 2).

Pursuant to Rule 26(e)(2), "[f]or an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition.  *Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due*." (emphasis added).   "Rule 26(e) 'does not grant a license to supplement a previously filed expert report because a party wants to, but instead imposes

an obligation to supplement the report when a party discovers the information it has disclosed is incomplete or incorrect.'" *Florentine v. Cates*, No. 6:06-CV-1155, 2008 WL 11355383, at *2 (N.D.N.Y. July 22, 2008) (quoting *Coles v. Perry*, 217 F.R.D. 1, 4 (D.D.C. 2003)).

Plaintiffs' supplementary disclosures are timely, as they were provided at the time of pretrial disclosures. Further, the supplementary reports do not contain any additional factual information, or any suggestion that Dr. Mantell altered his methodology in arriving at the damages calculation. Rather, the supplementary reports provide a modified amount of projected damages, including the present discounted value of the aggregate net economic loss, the aggregate income tax liability imputed to Decedent's lost earnings, and the present discounted value of the aggregate net economic loss, taking into account the income tax liability estimate. In other words, Dr. Mantell has not offered any new theories or opinions, but has instead merely updated his damages calculation, which is a proper function of a supplemental filing under Rule 26(e)(2). *See Speedfit LLC v. Woodway USA, Inc.,* No. CV 13-1276 KAM AKT, 2019 WL 1429609, at *4 (E.D.N.Y. Mar. 28, 2019) (explaining that under Rule 26(e)(2), an expert has "the ability . . . to update a previous damages calculation" but not to "assert[] new theories of damages which were never conveyed to the adversary in the first instance during either the fact or expert discovery periods"); *Park W. Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009) (admitting supplemental report that "updated the share and damages calculations" in the expert's original report).

To the extent Defendants challenge Dr. Mantell's qualifications to provide this type of information (*see* Dkt. 190 at 3 (noting that "plaintiffs have not disclosed anything suggesting Dr. Mantell is an expert in Canadian/Ontario taxation")), that may be probed through cross-examination. But the Court will not preclude this type of evidence—which was timely disclosed—on that basis alone.

B.     **Plaintiffs' Motion to Preclude Defendants from Cross-Examination of Dr. Mantell Regarding Prior Judicial Criticism**

Plaintiff has submitted to the Court three cases in which Dr. Mantell was harshly criticized by a panel of judges: *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202 (2d Cir. 1984); *Shu-Tao Lin v. McDonnell-Douglas Corp.*, 742 F.2d 45 (2d Cir. 1984); and *Escobar v. Seatrain Lines*, 175 A.D.2d 741 (1st Dep't 1991). In *Shatkin*, the Second Circuit stated:

> The district court noted a number of assumptions and assertions made by Dr. Mantell that were so unrealistic and contradictory as to suggest bad faith. For example, although the only contribution that the decedent had made to his mother was his assignment of the $96.01 monthly annuity due to expire in 1979, Dr. Mantell assumed that Lloyd would have contributed 20% of his disposable income to his mother. That figure was derived from statistics indicating that the average head of a household spends 20% of his income on himself; we find no basis for using that statistic in these calculations, where it has no relevance at all. In a further effort to justify such a high level of projected contributions, Dr. Mantell compared their discounted present value with Mrs. Shatkin's undiscounted projected consumption; such an "apples and oranges" comparison simply cannot withstand scrutiny. Moreover, after projecting Lloyd's income for 1990 to be either $151,990 or $117,700, Dr. Mantell deducted no state tax and applied a constant 11.7% federal tax rate. That assumption is highly suspect even when considered on its own; it is completely unacceptable when one realizes that he used a 23% rate in calculating the tax on Mrs. Shatkin's income from whatever award she might receive, which of course would be far less than Lloyd's annual income. Clearly such proposed testimony was riddled with errors, and therefore

excludable under Fed. R. Evid. 703.  In addition, it would probably have hopelessly confused and misled the jury because of the latter's inability to appraise the extremely questionable and unsupported assumptions underlying the testimony.  We therefore conclude that the trial court's decision to exclude that testimony was not erroneous.

727 F.2d at 208.  That same year, in *Shu-Toa Lin*, the Second Circuit stated:

> We agree that defendants did not have a fair trial.  Numerous errors occurred in the course of the trial.  The most prejudicial of these was allowing the jury to consider as evidence Dr. Mantell's lengthy, extravagant, and non-probative projections of Dr. Lin's future income.  Moreover, because defendants lacked the opportunity for adequate pretrial discovery, their cross-examination may have been less probing than one prepared with foreknowledge of Dr. Mantell's testimony.  Even if this jury had found damages identical to those ultimately calculated by Judge Sweet, therefore, the verdict could not stand.

742 F.2d at 49.  Finally, in *Escobar v. Seatrain Lines*, the New York State Appellate

Division, First Department stated:

> The award was grossly excessive, and was apparently accomplished through the testimony of plaintiff's economic expert, Dr. Edmund Mantell.  (Plaintiff also read excerpts from the testimony of the late Eugene Spector, plaintiff's other economist at the first trial.)  We observe that Dr. Mantell's testimony as an expert witness was cited by the Second Circuit Court of Appeals, which held, in reversing a judgment for pecuniary loss of a decedent's wife and children, that "[t]he most prejudicial of [the errors occurring in the course of the trial] was allowing the jury to consider as evidence Dr. Mantell's lengthy, extravagant, and non-probative projections of Dr. Lin's future income." *(Shu-Tao Lin v McDonnell Douglas Corp.,* 742 F2d 45, 49 [1984].)  Just nine months before that, the Second Circuit found Dr. Mantell's proposed testimony to be "highly suspect" and "riddled with errors," and affirmed the determination of the District Court to exclude his testimony after it had noted "a number of assumptions and assertions made by Dr. Mantell that were so unrealistic and contradictory as to suggest bad faith." *(Shatkin v McDonnell Douglas Corp.,* 727 F2d 202, 208 [1984].)

In the case now before us, Dr. Mantell projected that decedent would earn an average of $56,111 per year through 1989, and $145,686 per year until the year 2005 when decedent would have been 75 years of age. Dr. Mantell's testimony was improperly founded upon comparison of the earnings and work history of Mr. Fernandez, whose qualifications and earnings history were substantially different from the decedent's. Dr. Mantell's $4,016,400 projection of decedent's survivors' total economic loss was in our view highly speculative, and denied the defendant a fair trial.

175 A.D.2d at 742-43.

"The precise scope of cross-examination of an expert witness rests within the broad discretion of the trial court." *Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 325 (E.D.N.Y. 2001); *see also N.V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp.*, 590 F.2d 415, 421 (2d Cir. 1978) ("Although cross-examination is an essential element of our system of adversarial advocacy, the proper scope for cross-questioning is, like the qualification of witnesses, a matter of trial court discretion which we do not lightly disturb."). As explained in *Zinman v. Black & Decker, Inc.*, 983 F.2d 431 (2d Cir. 1993):

A trial court is allowed wide discretion in the management of the cross-examination of witnesses. "[I]n the last analysis the trial court is the governor of the trial with the duty to assure its proper conduct and the limits of cross-examination necessarily lie within its discretion. And we should not overrule the exercise of that discretion unless we are convinced that the ruling of the court was prejudicial."

*Id*. at 437 (quoting *United States v. Singh*, 628 F.2d 758, 763 (2d Cir. 1980)). "Nonetheless, unduly harsh limitation on cross-examination of a key expert witness can amount to prejudicial error." *N.V. Maatschappij Voor Industriele Waarden*, 590 F.2d at 421.

In support of their motion, Plaintiffs cite to *Blue Cross and Blue Shield,* where the court precluded cross-examination on prior judicial criticism of the plaintiff's expert based on findings of hearsay, prejudice, and undue influence.  (*See* Dkt. 172 at 2).  There, the defendants proffered the factual findings of a judge of the Quebec Superior Court who had denigrated the conclusions of the expert in a similar case.  141 F. Supp. 2d at 321.  The specific language denigrating the expert included:

> In an attempt to establish a correlation between advertising bans and consumption the [plaintiff] called [the expert] as a witness.  It should be pointed out that he was retained . . . as an expert for the purposes of this trial.  This witness struck the court as extremely intelligent and very skilled in the manipulation of ideas and statistics.  Unfortunately, he did not demonstrate the scientific objectivity that the court is entitled to expect from an expert witness of his stature.  He often evaded troublesome questions in giving evidence; it was often only on close and rigorous cross-examination by counsel for applicants that complete answers were obtained and, frequently, his answers were self-justifications.  This is all the more deplorable given that he was dealing with regression analysis, which is a complex subject. . . .
>
> Precise methodology, accurate data and the assurance of scientific rigour are essential in these matters where a simple error in the data, the methodology or the calculation affects all the results.  In this instance, the court is of the opinion that the input data used by [the expert] were unreliable and that his methodology led necessarily to the desired result.  Here again, the court entirely agrees with the analysis of reports and testimony of [the expert] made by [defendant's] counsel in his argument . . . and accords no probative value to those reports or that testimony.

*Id*. at 322.  In considering the scope of the expert's cross-examination, the court explained that "[j]udicial findings in other cases proffered as evidence are generally characterized as inadmissible hearsay."  *Id*. at 323.  The court noted that "[e]xcluding credibility assessing statements by judges in other cases avoids the practical difficulty of weighing judicial opinions against contrary evidence," and "[t]he difficulty in assessing the probative force

of comments by a judge on the credibility of a witness is especially great for a jury, which

may give exaggerated weight to a judge's supposed expertise on such matters." *Id*. The

court further noted that "[t]he restrictions governing judicial findings in other cases contrast

with the broad latitude permitted counsel in cross-examining experts." *Id*. at 324. The

court ultimately held:

> The proposed evidence is inadmissible. It is also unfair. When a judge
> attacks a witness there is no effective defense. Peer review of such witnesses
> is different; if an expert does not act properly that expert ought to be attacked
> in the normal course of scientific debate—or in the case of a trial, with the
> opportunity for rehabilitation and explanation. To appropriately meet the
> evaluations of another judge would require the jury to delve deeply into the
> case that judge was trying. This enterprise is not appropriate under Rule 403.
> The critical comments of the judge were appropriate since he was the trier of
> fact in a non-jury case, but introduction of that opinion in the present case
> risks jeopardizing the jury's independent assessment of the expert's
> testimony. This court has found the expert's present testimony sufficiently
> reliable . . . . Allowing another judge to disturb evaluations of credibility
> specifically left to the present jury is not contemplated by the Federal Rules
> and is not desirable.
>
> In this case the cross examination of the witness was blistering and lasted
> more than a full trial day. An extensive deposition and exchange of reports
> provided ample fuel for the broad-based attack on the expert's credibility.
> Defendants' experts will continue the attack. They do not need another judge
> as an ally.

*Id*. at 325. However, the court further clarified that "[w]hile a trial court should prevent

outside judicial decisions from clouding jury findings, it may consider them itself in

deciding whether an expert's proposed testimony is sufficiently reliable to permit it under

Rule 702 of the Federal Rules of Evidence." *Id*.

Another court in this Circuit reached a similar conclusion in *L-3 Communications*

*Corp. v. OSI Systems, Inc*., No. 02 Civ. 9144(PAC), 2006 WL 988143 (S.D.N.Y. Apr. 13,

2006).  In that case, the court granted the defendant's motion to preclude argument or evidence before the jury concerning court opinions in unrelated cases commenting on their damages expert,  which contained "negative judicial findings of fact regarding expert reports prepared and testimony given by [the expert] in cases litigated in other fora."  *Id.* at \*3.  The court explained that "[the plaintiff] may cross-examine [the expert] but not on the basis of the extrajudicial proceedings.  [The plaintiff] may present argument regarding these court opinions, outside of the hearing of the jury, during the Court's examination of [the expert's] qualifications."  *Id.* at \*4; *see also U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1375 (2d Cir. 1988) (district judge did not err by precluding cross-examination of the defendant's damages expert about testimony he gave in unrelated cases, which was rejected by the district court but vindicated on appeal, as "[i]t was well within [the district judge's] discretion to avoid a confusing and certainly complex digression into two earlier trials and appeals," and "[p]robing into the qualifications of an expert is a far cry from probing into differing judicial reactions to [the expert's] prior testimony in totally unrelated cases.").

Consistent with the reasoning in *Blue Cross and Blue Shield* and *L-3*, the Court find it appropriate to preclude Defendants from cross-examining Dr. Mantell regarding prior judicial criticism in the presence of the jury.  The prior judicial criticism at issue is hearsay, and the Court does not find any exception to the rule against hearsay applicable here.  Further, the cases in which Dr. Mantell was criticized are from 30 or more years ago, and he has offered testimony in many cases since that time without such criticism.  The Court finds that allowing the defense to introduce these judicial criticisms from several decades

- 19 -

ago would result in confusion to the jury and be unfair and prejudicial. It would be particularly confusing to the jury to have to dig into the facts of the earlier cases and try to compare the methodology used by Dr. Mantell in those cases with the methodology used in the instant case. Consistent with the Federal Rules of Evidence, Defendants will be afforded the opportunity to cross-examine Dr. Mantell; however, they may not probe into prior judicial commentary on Dr. Mantell's testimony, which could threaten to "disturb evaluations of credibility specifically left to the present jury[.]" *Blue Cross and Blue Shield*, 141 F. Supp. 2d at 325.

The Court is not persuaded by Dr. Kothari's argument that he should be allowed to question Dr. Mantell regarding the prior judicial criticism under Federal Rule of Evidence 608(b). Rule 608(b), which governs a witness's character for truthfulness or untruthfulness, provides:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
>
> (1) the witness; or
>
> (2) another witness whose character the witness being cross-examined has testified about.

The United States District Court for the District of Vermont addressed this issue in the context of a criminal case in *United States v. Fell*, No. 5:01-cr-12-01, 2018 WL 7247414 (D. Vt. Apr. 4, 2018). In *Fell*, the defense moved to preclude cross-examination of its expert witnesses "concerning prior testimony in other cases in which judges found

that the testimony was not credible." *Id.* at \*4.  The court cited to case law from the Second Circuit holding that "Rule 608(b) permits a cross-examiner to introduce earlier findings by other judges as evidence of an untruthful character." *Id.*; *see also United States v. Terry*, 702 F.2d 299, 316 (2d Cir. 1983) (prosecutor permitted to question the defendant's "voice expert" witness as to "prior occasions when his testimony in other cases had been criticized by the court as unworthy of belief," as "[p]roof that a judge of the District of Columbia Superior Court before whom [the expert] had testified as an expert had found that [the expert] had 'guessed under oath' was probative of the weight to be accorded to his testimony.").

The *Fell* court discussed *United States v. Cedeño*, 644 F.3d 79 (2d Cir. 2011), where the Second Circuit found that the district court erred in precluding the defense from cross-examining one of the government's witnesses, Detective Robert Goldrick, regarding a prior adverse credibility finding.  Specifically, "[i]n 1990, the Appellate Division refused to credit Goldrick's testimony at a suppression hearing because it concluded that he had 'patently tailored' his testimony to avoid suppression of evidence discovered at a traffic stop. . . .  In other words, the Appellate Division found that Goldrick had lied." *Id.* at 81. The Second Circuit found that the district court had erred by relying only on the factors articulated by *United States v. Cruz*, 894 F.2d 41 (2d Cir. 1990), *i.e.*, "(1) whether the prior judicial finding addressed the witness's veracity in that specific case or generally; and (2) whether the two sets of testimony involved similar subject matter." *Id.* at 82 (explaining that the district court should not have limited its analysis to the two factors discussed in *Cruz*, because "in *Cruz* [the Second Circuit] did not purport to set out a rigid two-part

test.").  The *Cedeño* court held that the district court erred in limiting its analysis to the two factors discussed in *Cruz*, and could have considered:

> (1) whether the lie was under oath in a judicial proceeding or was made in a less formal context; (2) whether the lie was about a matter that was significant; (3) how much time had elapsed since the lie was told and whether there had been any intervening credibility determination regarding the witness; (4) the apparent motive for the lie and whether a similar motive existed in the current proceeding; and (5) whether the witness offered an explanation for the lie and, if so, whether the explanation was plausible.

*Id*. at 83.

One year later, in *United States v. White*, 692 F.3d 235 (2d Cir. 2012), the Second Circuit held that the district court erred by excluding cross-examination of government witness, Detective Paul Hermann, regarding prior judicial credibility findings in a 2009 case.  *Id*. at 241, 248.  The Second Circuit explained that it had "little trouble concluding that [the judge's] prior credibility finding against Herrmann was relevant and highly probative in this case," and that "[t]hese credibility judgments are plainly probative of Herrmann's veracity and could affect a jury's determination as to his willingness to lie to secure a criminal conviction.  Moreover, they are particularly relevant in the case before us where the crux of the defense was that Herrmann lied about finding a weapon in [the defendant's] pocket instead of elsewhere in the vehicle."  *Id*. at 250.  The *White* court found that the district court's exclusion of this evidence "cannot be located within the range of possible decisions."  *Id*. at 251.

The *Fell* court ultimately denied the defendant's motion to preclude the government from cross-examining its experts, concluding that it would:

take up each instance of prior judicial criticism of an expert as it arrives. The multiple factors identified by *Cedeño* cannot be applied in the abstract. There is good reason to be cautious about allowing cross-examination on prior instances of judicial criticism. Each instance of prior judicial criticism opens the possibility of a significant detour into whether the previous judge was correct in the previous case. The result in this case cannot be that blistering judicial criticism—to which no response was possible at the time it was administered—simply hangs in the air and damages the witness's credibility. In addition, the court will be obliged to consider the scope of cross-examination under Rule 403.

*Fell*, 2018 WL 7247414, at *5.

There are key differences between the instant case and *Cedeño* and *White*. First, *Cedeño* and *White* were criminal cases, where based on Sixth Amendment rights the cross-examination rights of a defendant as to a government witness are particularly robust. *See White*, 692 F.3d at 248 ("In applying [Rule 608], '[w]hile a district court may impose "reasonable limits" on cross-examination to protect against, e.g., harassment, prejudice, confusion, and waste, <u>it must also give wide latitude to a defendant in a criminal case to cross-examine government witnesses</u>.'" (quoting *Cedeño*, 644 F.3d at 82, and emphasis added)).

Second, the witnesses in *Cedeño* and *White* were fact witnesses, and the prior judicial criticism at issue involved misrepresentations of fact, and not, as is the case here, the reliability of an expert's analysis. Rule 608(b) applies only to evidence that relates to truthfulness and untruthfulness, and it is not clear to the Court that sloppy and unreliable methodology by an expert witness (as opposed to deliberately misleading conduct) falls within its purview. In other words, a finding that a particular methodology does not pass muster under Rule 702 (or comparable state law evidentiary rules) is not the same as a

finding that an expert has deliberately lied to the Court or the jury.  The factors identified by the Second Circuit in *Cedeño* support the conclusion that Rule 608(b) is inapposite here, inasmuch as they assume that there has been a "lie," and are clearly not tailored for a situation in which the judicial criticism addressed expert methodology.

Lastly, assuming that Rule 608(b) and the factors identified in *Cedeño* apply here, an assessment of those factors supports precluding cross-examination based on the prior judicial criticism of Dr. Mantell.  The prior judicial findings were addressed specifically to the methodology used by Dr. Mantell in the cases at issue.  The most recent of the three cases is from approximately 30 years ago; the other two cases are from approximately 37 years ago—the substantial passage of time strongly cuts against Dr. Kothari's position.  Dr. Mantell has also presented expert testimony in numerous proceedings over the last 30 years without any apparent repeat of the earlier judicial criticism.  Moreover, while the criticism addressed expert testimony offered in a judicial proceeding about a significant matter, as discussed above, there was no "lie" by Dr. Mantell.  Finally, questions of motivation and plausibility have little apparent relevance here, where the issue is the soundness of an expert witness's methodology.  Again, the fact that a court found a particular methodology unreliable is not equivalent to a conclusion that the methodology was deliberately misleading.[3]

---

[3]     The Court recognizes that in *Shatkin*, the Second Circuit described Dr. Mantell's methodology as so substandard "as to suggest bad faith."  727 F.2d at 208.  However, the *Shatkin* court did not make an actual finding of bad faith, and the criticisms of Dr. Mantell's work set forth therein are about such matters as the relevance of particular statistics, comparing discounted present value to undiscounted projected consumption, and application of the proper tax rate.  In other words, it is clear that the issue with Dr. Mantell's

For all these reasons, the Court grants Plaintiffs' motion to preclude Defendants from cross-examining Dr. Mantell on the prior judicial criticism discussed above.

## II.    Motion to Disqualify Michael Carnegie

Plaintiffs have moved to disqualify Michael Carnegie ("Carnegie"), a partner in the Canadian accounting firm of Taylor Leibow LLP ("Taylor Leibow") who has been retained by Dr. Kothari as an expert witness. (Dkt. 168). Plaintiffs contend that Carnegie has a conflict of interest because Taylor Leibow, "specifically including Mr. Carnegie, had a decades-long prior confidential relationship with" Junger and Decedent. (*Id*. at 1). Dr. Kothari opposes this motion, arguing that Taylor Leibow's relationship with Junger and Decedent ended in 2008 and that Carnegie never personally performed work for Junger, never met or performed work for Decedent, is unaware of any confidential information relating to Plaintiffs, and relied only on tax documents obtained through discovery in preparing his loss report. (Dkt. 183 at 2). Dr. Kothari further argues that Plaintiffs have been aware of Carnegie's involvement in the matter since December 7, 2017, yet waited until the eve of trial to seek disqualification and have thus waived any objection. (*Id*. at 2-3).

"The court's authority to disqualify a party's expert or consultant is based on its inherent power to preserve the integrity of the adversary process." *Gordon v. Kaleida Health*, No. 08-CV-378S F, 2013 WL 2250506, at *5 (W.D.N.Y. May 21, 2013) (quotation omitted). "While the reasons behind disqualifying an expert witness are similar to those

---

work in *Shatkin* was that his methodology was sloppy and unsound—there was no finding that he was knowingly presenting false information.

behind disqualifying an attorney that has a conflict of interest, the two scenarios are distinguishable and subject to different standards*." Grioli v. Delta Int'l Mach. Corp.*, 395 F. Supp. 2d 11, 14 (E.D.N.Y. 2005).   In particular, because "[u]nlike attorneys, expert witnesses serve generally as sources of information and not necessarily as recipients of confidences,"   courts do "not apply the stringent attorney-client conflict standards" in determining whether an expert should be disqualified.  *Id*. at 13  (quotation omitted).

Instead, "[d]isqualification of an expert or consultant generally requires that the party seeking disqualification show that (i) [the moving party] held an objectively reasonable belief in the existence of a confidential relationship with the challenged expert; and (ii) during the relationship there was a disclosure of confidential or privileged information to the expert that is relevant to the current litigation." *Breitkopf v. Gentile*, No. CV121084, 2014 WL 12843765, at *3 (E.D.N.Y. Mar. 24, 2014); *see also Gordon*, 2013 WL 2250506, at *5 ("The burden is on the party seeking disqualification to show . . .[an] objectively reasonable belief that a confidential relationship existed with the expert or consultant and that a party's confidential information was actually disclosed to the expert or consultant." (internal quotation marks omitted)).   The Court may further consider whether "the public [has] an interest in allowing or not allowing the expert to testify," *Grioli*, 395 F. Supp. 2d at 14, as well as "whether another expert is available and whether the opposing party had time to hire him or her before trial," *Koch Ref. Co. v. Jennifer L. Boudreau M/V*, 85 F.3d 1178, 1183 (5th Cir. 1996)   "Disqualification is a drastic remedy and should be resorted to rarely." *Breitkopf*,  2014 WL 12843765, at *3 (citation and alteration omitted).

In addition to proving the elements discussed above, "[t]he party seeking disqualification bears the burden of establishing . . . its non-waiver." *English Feedlot, Inc. v. Norden Labs., Inc.*, 833 F. Supp. 1498, 1501-02 (D. Colo. 1993); *see also Hinterberger v. Catholic Health Sys., Inc.*, No. 08-CV-380S F, 2013 WL 2250591, at *24 (W.D.N.Y. May 21, 2013) ("Defendants' theory, unsupported by caselaw, that despite failing to inform Plaintiffs' counsel and the court Defendants somehow preserved their right to timely seek disqualification from the court, without having waived Defendants' objection, after Defendants' alleged complaints to [the expert witness] were ignored, over more than one-year prior to the motion, is untenable."); *Barrett v. United States*, 651 F. Supp. 606, 607 (S.D.N.Y. 1986)  ("This court ruled . . that the Government had waived its conflict of interest claim by failing to raise that claim several years earlier when an affidavit by this same [expert] witness was first presented by plaintiff in connection with a summary judgment motion.  Furthermore, in the intervening years the Government had not raised any such concern about the expert's possible conflict.").

Here, Dr. Kothari argues that Plaintiffs waived any right to seek disqualification of Carnegie because, despite Carnegie having been disclosed as an expert witness in December 2017, Plaintiffs waited over two years to seek disqualification.  Plaintiffs argue in reply that their motion is timely because it was filed by the deadline for motions in limine and further that Dr. Kothari "knew of the potential for conflict at the time he hired Carnegie" and thus assumed the risk that Carnegie would potentially be disqualified.  (Dkt. 186 at 4).

The Court agrees with Dr. Kothari that Plaintiffs were obliged to assert a conflict of interest with Carnegie prior to the eve of trial.  *See Hinterberger*, 2013 WL 2250591, at *24 ("[T]he only relevant communication of an objection to a challenged expert or consultant's services to an opponent is not to the objected expert or consultant, or, for that matter, to the opponent's counsel, but to the court by a formal request to disqualify."); *Wisconsin Local Gov't Prop. Ins. Fund v. CH2M Hill, Inc*., No. 02-C-302-DRH, 2005 WL 8165822, at *2 (E.D. Wis. Dec. 8, 2005) ("Plaintiffs had the opportunity to address this alleged potential conflict of interest either during expert witness disclosures or after [the expert's] deposition was taken. . . .  Bringing forth this argument with trial only one month away is not acceptable, especially given that this is not newly-discovered information."). While it may be the case that Dr. Kothari initially ran the risk of disqualification by hiring an expert who had a previous relationship with Junger and Decedent, once Plaintiffs became aware that Carnegie was working for Dr. Kothari, it was incumbent upon them to timely raise the issue for prompt resolution by the Court.  Instead, they waited until after expert discovery had closed and trial was impending to seek disqualification.  *See Dyson, Inc. v. Bissell Homecare, Inc*., 951 F. Supp. 2d 1009, 1028 (N.D. Ill. 2013) ("[The defendant] could have brought the instant motion at a much earlier point in this litigation. . . .  Granting [the defendant's] motion at this late juncture would effectively pull the rug from under [the plaintiff], leaving [the plaintiff] without a key expert and causing unfair prejudice to [the plaintiff]. Therefore, based on the above, [the defendant's] motion to disqualify [the expert witness] from serving as an expert is denied."); *In re Nat'l Century Fin. Enterprises, Inc. Fin. Inv. Litig.*, No. 2:03-MD-1565, 2010 WL 1257598, at *10-11

(S.D. Ohio Mar. 29, 2010) ("Delay in bringing this matter to the attention of plaintiffs' counsel and the court has resulted in increased and unnecessary expense. Plaintiffs have paid a significant fee to an expert that they cannot use. Both parties have expended significant costs in briefing this issue. While it is clear that plaintiffs failed to adequately investigate potential conflicts, [the defendant] was aware of the conflict and did not nothing to address this issue in a timely manner. As a result, the court finds that disqualification under these circumstances is not warranted."). Under these circumstances, the Court finds it inappropriate to disqualify Carnegie.

The Court further finds that even if Plaintiffs have not waived any conflict with respect to Carnegie, they have failed to establish that any confidential information Carnegie may have been exposed to as a result of Junger's and Decedent's prior relationship with Taylor Leibow is relevant to the instant litigation. Plaintiffs argue that Decedent's 2007 tax return, which was prepared by Taylor Leibow, is key to their damages claim. (*See* Dkt. 168 at 4-5). However, the tax return itself does not constitute confidential information sufficient to support disqualification, inasmuch as it was submitted to the appropriate governmental authorities and produced in connection with the instant litigation. Further, there is no suggestion in the record before the Court that there is any dispute over the accuracy of the 2007 tax return. Instead, the parties dispute whether the 2007 tax return is an accurate predictor of Decedent's future income. Plaintiffs have not presented any proof that such an inquiry relies on any confidential information to which Carnegie was privy. On these facts, Plaintiffs have not established that this is the rare case in which disqualification of an opposing party's expert witness is warranted.

## III.   Motions Regarding Testimony as to Dr. Mallavarapu

Plaintiffs have filed motions seeking to preclude both Dr. Singh's expert interventional cardiologist Dr. Nishith Amin ("Dr. Amin") and Dr. Kothari's expert non-interventional cardiologist Dr. Judy Ann Joy-Pardi ("Dr. Joy-Pardi") from testifying that Dr. Mallavarapu (or any other defendant or former defendant) deviated from good and accepted medical practice.  (Dkt. 169; Dkt. 170).  Both Defendants oppose this motion, and Dr. Singh has cross-moved to preclude Plaintiffs from introducing any evidence at trial that Dr. Mallavarapu did not commit medical malpractice.  (Dkt. 183; Dkt. 184).   In the alternative, Dr. Singh argues that Plaintiffs should not be permitted to introduce deposition testimony by Dr. Mallavrapu's expert interventional cardiologist, Dr. Phillip Duncan, because such evidence is more prejudicial than probative.  (Dkt. 184 at 18-19).

### A.   Judicial Estoppel

Plaintiffs and Dr. Singh rely on the doctrine of judicial estoppel in arguing as to the admissibility of evidence regarding Dr. Mallavarapu's treatment of Decedent.   As the Supreme Court has explained:

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.  This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.

*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quotations, citations, and alteration omitted).   "[T]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle."  *Id.*  However,

"in evaluating whether to apply the doctrine of judicial estoppel, courts generally look for the existence of three factors: (1) that a party's new position is 'clearly inconsistent' with its earlier position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party 'would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Intellivision v. Microsoft Corp*., 484 F. App'x 616, 619 (2d Cir. 2012) (quoting *New Hampshire*, 532 U.S. at 750-51). The Second Circuit "further limit[s] judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain." *DeRosa v. Nat'l Envelope C*orp., 595 F.3d 99, 103 (2d Cir. 2010). "This latter requirement means that judicial estoppel may only apply where the earlier tribunal accepted the accuracy of the litigant's statements." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 696 (2d Cir. 2011).

Here, Plaintiffs argue judicial estoppel bars Drs. Amin and Joy-Pardi from testifying at trial as to malpractice by Dr. Mallavarapu based on statements made by counsel at these experts' respective depositions. (*See* Dkt. 169 at 2-7; Dkt. 170 at 2-5). Plaintiffs' argument fails, because at no point was there judicial acceptance as to these statements by counsel. *See Crawford v. Franklin Credit Mgmt. Corp*., 758 F.3d 473, 486 (2d Cir. 2014) (rejecting judicial estoppel argument because there had been no ruling by the court on the initial representation, and there was accordingly "no risk of inconsistent adjudications"); *Bates v. Long Island R. Co*., 997 F.2d 1028, 1038 (2d Cir. 1993) (holding that there was "no basis for the district court to apply judicial estoppel" where there had been "no judicial acceptance" of the representation at issue). With respect to Dr. Amin, although Plaintiffs'

counsel initially threatened to call the Court regarding the refusal to answer certain questions, he ultimately did not make such a call. (*See* Dkt. 169 at 2-7) With respect to Dr. Joy-Pardi, the parties did call the Court and spoke to the magistrate judge's law clerk; however, they were advised that the magistrate judge was not available to resolve the issue and that motion practice would be necessary. (*See* Dkt. 170 at 2-5). Ultimately, no such motion was ever filed. Accordingly, at no point did the Court accept or rely upon any of the statements, and judicial estoppel is not implicated.

The same analysis applies to Dr. Singh's argument that Plaintiffs should be judicially estopped from arguing that Dr. Mallavarapu did not commit malpractice. While the Court found in its Decision and Order dated August 8, 2019, that Dr. Mallavarapu had failed to appropriately interpret Decedent's aortogram (*see* Dkt. 144 at 17-18), that position had been taken not by Plaintiffs but by Drs. Deak and Buckley. Further, the Court did not affirmatively find that this failure by Dr. Mallavarapu amounted to malpractice, as that issue was not before it. Accordingly, Plaintiffs have never persuaded this Court (or any court) to accept the position that Dr. Mallavarapu committed malpractice, and they are not judicially estopped from now taking a contrary position. The Court further notes that, in any event, Plaintiffs have clarified that they do not intend to affirmatively claim at trial that Dr. Mallavarapu was not negligent or that he did not deviate from the standard of care. (Dkt. 188 at 8-9).

For all these reasons, the Court rejects Plaintiffs' and Dr. Singh's arguments that judicial estoppel prevents either side from presenting evidence regarding Dr. Mallavarapu's negligence (or lack thereof).

## B.    Failure to Answer Deposition Questions

In addition to asserting judicial estoppel, Plaintiffs have argued that Defendants should be barred from eliciting testimony regarding Dr. Mallavarapu's claimed malpractice as a discovery sanction—that is, because counsel prevented Drs. Amin and Joy-Pardi from answering questions on this topic at deposition.  (*See* Dkt. 187 at 2; Dkt. 188 at 3-4).

"It is well-settled that a deponent is required to answer questions at his oral deposition unless an objection is interposed based on privilege, to enforce a court ordered limitation, or to enable the witness to seek relief from questioning which creates unreasonable annoyance, embarrassment, or is found oppressive. . . ."  *Scott v. Howard*, No. 15-CV-1000A(F), 2019 WL 311618, at *1 (W.D.N.Y. Jan. 24, 2019); *see also* Fed. R. Civ. P. 30(C)(2) ("A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).").  Here, defense counsel improperly instructed Drs. Amin and Joy-Pardi not to answer questions at their respective depositions for impermissible reasons. (*See, e.g.,* Dkt. 170-2 at 63 (refusing to let Dr. Joy-Pardi answer the question "[A]re you critical of any of the care provided to [Decedent] in this case?" because it was outside the scope of her expert report); Dkt. 169-2 at 26-27 (refusing to let Dr. Amin answer questions regarding Dr. Mallavarapu's conduct as "outside of his expert disclosure")); *see also Ferring Pharm. Inc. v. Serenity Pharm.*, LLC, 331 F.R.D. 75, 79 (S.D.N.Y. 2019) (finding counsel "acted improperly" in instructing expert not to answer questions at deposition on basis that they were outside the scope of agreed upon discovery); *In re Omeprazole Patent Litig.*, No. M-21-81(BSJ), 2005 WL 818821, at *4 (S.D.N.Y. Feb. 18, 2005) (finding it

improper for counsel to refuse to allow expert witness to answer questions about subject matters not contained in his amended expert reports—"[c]ounsel's proper course would have been to allow the questioning to continue subject to objection"); *Bechard v. Costanzo*, No. 91-CV-1358, 1995 WL 105991, at *3 (N.D.N.Y. Feb. 24, 1995) (finding that counsel's direction to expert witness to not answer questions related to subject matter outside the scope of his expert disclosure "was improper because it fell outside the scope of reasons expressly provided for by the Federal Rules"). "The court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2).

While it may be appropriate in certain cases to preclude an expert from testifying at trial based on a refusal to answer deposition questions, *see Kansas City Fire & Marine Ins. Co. v. Long Island Power Auth.,* No. CV 05-4944 (AKT), 2007 WL 7034284, at *6 (E.D.N.Y. Nov. 23, 2007), that draconian sanction is not warranted where, as here, "there is sufficient time before trial to reopen the deposition and get [the expert's] answers," *The Topps Co. v. Cadbury Stani S.A.I.C.*, No. 99 CIV. 9437 (CSH), 2006 WL 176995, at *1 (S.D.N.Y. Jan. 20, 2006); *see also Ferring Pharm.*, 331 F.R.D. at 78 ("[B]efore precluding a party from introducing relevant evidence because of a discovery violation, a court should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses." (citation omitted)).  The Court accordingly denies Plaintiffs' request for preclusion of testimony as a discovery sanction.

- 34 -

However, the Court is persuaded based on the record before it that Plaintiffs should be afforded an opportunity to question Drs. Amin and Joy-Pardi as to Dr. Mallavarapu's conduct prior to trial.  Plaintiffs are correct that defense counsel made representations at deposition that these expert witnesses would not be opining as to whether Dr. Mallavarapu violated the standard of care, yet this no longer appears to be the case.  Accordingly, should Plaintiffs make a request to reopen expert discovery for this limited purpose, the Court will grant that request.  The Court would further entertain a request for appropriate fees and costs associated with reopening Dr. Amin's and Dr. Joy-Pardi's depositions.

### C.  Admissibility of Dr. Duncan's Testimony

Dr. Singh argues, in the alternative to his request for preclusion, that Plaintiffs should be precluded from introducing deposition testimony by Dr. Duncan as to Dr. Mallavarapu's conduct because it is more prejudicial than probative.  "Relevant evidence . . . may be excluded 'if its probative value is substantially outweighed by a danger of unfair prejudice or needlessly presenting cumulative evidence.'" *Mirlis v. Greer*, 952 F.3d 36, 46 (2d Cir. 2020) (quoting Fed. R. Evid. 403) (alterations omitted).  Here, Dr. Singh argues that it would be confusing to the jury, and thus unduly prejudicial, for Plaintiffs to offer testimony from both Dr. Duncan, who opined that Dr. Mallavarapu was not negligent, and from other experts who will opine that Dr. Mallavarapu was negligent.  (*See* Dkt. 184-1 at 18-19).

Evidence regarding Dr. Mallavarapu's actions in this case is indisputably relevant. Although Plaintiffs have settled with Dr. Mallavarapu, pursuant to New York General Obligations Law § 15-108 (which applies to this diversity action), any jury verdict for

Plaintiffs must be offset by the greater of either the settlement amount or Dr. Mallavarapu's proportionate share of liability. In other words, the jury in this case will be called upon to apportion liability between Dr. Mallavarapu and Defendants. Dr. Duncan's testimony is highly probative of this issue.

Further, Plaintiffs have clarified that they do not seek to present Dr. Duncan's testimony to argue that Dr. Mallavarapu was not negligent, but instead to "explain . . . the expectations of Dr. Mallavarapu . . . with regard to the after-treating cardiologist and hospitalist." (Dkt. 188 at 8-9). The Court finds that such evidence will not unduly confuse the jury and should not be excluded under Rule 403.

## IV.   Dr. Singh's Objections Regarding the Use of Deposition Testimony

Finally, the Court considers Dr. Singh's objections to portions of Plaintiffs' pretrial memorandum. As noted above, Dr. Singh objects to Plaintiffs' stated intentions to: (1) introduce deposition testimony of Dr. Deak, Dr. Buckley, and Dr. Mallavarapu at trial; (2) introduce portions of Dr. Duncan's deposition testimony at trial; and (3) call Dr. Singh's expert economist, Matthew McCabe ("McCabe"), in presenting their direct case. (Dkt. 195).

As a threshold matter, the Court rejects Plaintiffs' argument that Dr. Singh's objections were not timely filed insofar as Dr. Singh objects to the introduction of deposition testimony. The Pretrial Order entered on September 4, 2019, provides that "any party objecting to the use of deposition testimony" must file said objections "[a]t least one week before the pretrial conference," which in this case was set for April 22, 2020. (Dkt.

151 at 2, 5).  Dr. Singh filed his objections on April 15, 2020, in compliance with the Pretrial Order.

However, Dr. Singh's argument that Plaintiffs should not be allowed to call McCabe as a witness in their case in chief was arguably not timely raised, because it does not deal with deposition testimony.  However, because Dr. Singh was apparently not aware that Plaintiffs intended to call McCabe until it reviewed Plaintiffs' pretrial memorandum, and because Plaintiffs have had the opportunity to file a reply in support of their position, the Court will consider Dr. Singh's objection with respect to McCabe.

With respect to the deposition testimony of Dr. Deak, Dr. Buckley, and Dr. Mallavarapu, Plaintiffs argue that they may admit such testimony pursuant to Federal Rule of Civil Procedure 32(a)(3), which provides that "[a]n adverse party may use for any purpose the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4)."  Dr. Singh argues that Rule 32(a)(3) no longer applies to Dr. Deak, Dr. Buckley, and Dr. Mallavarapu, because they are no longer parties to the instant action.  (Dkt. 195 at 3).  Dr. Singh has cited no case law to support this contention, and the Court's own research has not uncovered any discussion of this issue within the Second Circuit.  However, there are out-of-Circuit decisions supporting the conclusion that Rule 32(a)(3) is not applicable to parties who have been dismissed from the action.  *See, e.g., Powertrain, Inc. v. Ma*, 88 F. Supp. 3d 679, 691 (N.D. Miss. 2015) (finding deposition testimony not admissible because party "was dismissed on default judgment earlier in this proceeding and thus was not a party to this action at the time of trial"), *aff'd,* 640 F. App'x 263 (5th Cir. 2016); *Estate of Thompson v.*

*Kawasaki Heavy Indus., Ltd.*, 291 F.R.D. 297, 311 (N.D. Iowa 2013) (deposition testimony could not be used in the plaintiff's case-in-chief where party who had designated deponent was subsequently dismissed from the case).

Nonetheless, even assuming that Plaintiff cannot admit the deposition testimony at issue under Rule 32(a)(3), the Court cannot determine at this time whether such testimony would be admissible at trial under Rule 32(a)(4). In particular, because there is currently no trial date set in this matter, the Court cannot ascertain whether Dr. Deak, Dr. Buckley, and/or Dr. Mallavarapu will qualify as an unavailable witness at the time of trial. Accordingly, the Court finds that this issue is not yet ripe for resolution. When the trial of this matter is rescheduled, the Court will issue an amended pretrial order setting forth deadlines for updated pretrial filings; if necessary upon the submission of all such filings, the Court will resolve this issue at that time.

Turning to Dr. Duncan's deposition testimony, the Court has already, in resolving the parties' motions in limine, determined that Dr. Duncan's testimony is relevant to the issues in this case and is not otherwise inadmissible due to its substance. Accordingly, the Court need consider only two additional procedural arguments made by Dr. Singh: (1) that Plaintiffs failed to comply with the disclosure requirements of Federal Rule of Civil Procedure 26 with respect to Dr. Duncan; and (2) that Plaintiffs should be required to call Dr. Duncan as a live witness. (*See* Dkt. 195 at 8-9).

There is no "*per se* rule precluding a party from relying on the testimony of an adverse party's expert in its case-in-chief." *NetAirus Techs., LLC v. Apple, Inc*., No. LA CV10-03257 JAK EX, 2013 WL 9570686, at *1 (C.D. Cal. Nov. 11, 2013). Instead,

"[d]ecisions regarding the mode and order of witness questioning lie within the district court's broad discretion." *Nat'l R.R. Passenger Corp. v. Certain Temp. Easements Above R.R. Right Of Way In Providence, Rhode Island*, 357 F.3d 36, 42 (1st Cir. 2004) (affirming district court ruling allowing party to call opponent's expert during its case-in-chief).

Dr. Singh's argument that Plaintiffs were required by Rule 26 to designate Dr. Duncan as an expert witness is "wholly unpersuasive." *Kerns v. Pro-Foam of S. Alabama, Inc.*, 572 F. Supp. 2d 1303, 1309 (S.D. Ala. 2007). In *Kerns*, the court rejected this argument, noting because the expert witness's "expertise, knowledge and opinions as they relate to the particular material issues" involved in that case were well known to all involved, "[t]he risk of unfair surprise to defendant" in allowing the plaintiff to call the expert was "exactly nil." *Id.* at 1310; *see also Olsen v. Delcore*, No. 2:07-CV-334 TS, 2009 WL 3055411, at *2 (D. Utah Sept. 24, 2009) (allowing the plaintiff to call expert retained by the defendant as a witness in her case-in-chief because "once a party has given testimony the opinions do not belong to anyone and are available for all parties to use at trial"). The same is true here—while Dr. Duncan was initially designated as an expert by Dr. Mallavarapu, Dr. Singh was provided with his expert report and his attorney was present at Dr. Duncan's deposition. Dr. Singh is "leaning on the Rule 26 disclosure requirements to secure a tactical advantage that these rules were never intended to confer." *Kerns*, 572 F. Supp. 2d at 1310.

Further, the Court does not find that Plaintiffs are required to call Dr. Duncan as a live witness. It is undisputed that Dr. Duncan lives and works more than 100 miles from the courthouse and he is thus an unavailable witness whose deposition testimony may be

used "for any purpose." Fed. R. Civ. P. 32(a)(4)(b). In *Nichols v. Am. Risk Mgmt.*, No. 89 CIV. 2999(JSM)(AJP), 2000 WL 97282 (S.D.N.Y. Jan. 28, 2000), the court considered "whether one party (here, plaintiff) can use the deposition testimony of another party's expert (here, that of a defendant who since has settled out) against a remaining adverse party (here, a remaining defendant) . . . where the expert lives and works over 100 miles from the courthouse." *Id.* at *1. The court concluded that the use of such testimony was permissible, absent "special circumstances." *Id.* at *2. No such special circumstances are present here. As noted above, Dr. Singh's attorney was present at Dr. Duncan's deposition and had the opportunity to cross-examine him. Further, Dr. Singh has failed to articulate any questions that he would have asked Dr. Duncan at his deposition had he known Plaintiffs would subsequently seek to admit Dr. Duncan's testimony as part of their case in chief. The Court finds no reason to depart from Rule 32(a)(4)(B) under these circumstances and will allow Plaintiffs to present Dr. Duncan's deposition testimony to the jury.

However, the Court agrees with Dr. Singh that Plaintiffs should be precluded from calling Dr. Singh's expert economist McCabe as part of their case-in-chief. While the Court rejects Dr. Singh's argument based on the Rule 26 disclosure requirements, for the reasons discussed above with respect to Dr. Duncan, the Court is persuaded by Dr. Singh's contention that McCabe's testimony would be duplicative, confusing for the jury, and more prejudicial than probative.

Plaintiffs have made it clear in their response to Dr. Singh's objections that McCabe would not add anything substantive to Dr. Mantell's conclusions—indeed, Plaintiffs note

that "Dr. Mantell and Mr. McCabe used virtually identical methodologies and came up with virtually identical projections." (Dkt. 199 at 6). Instead, the purpose for which McCabe is to be called, according to Plaintiffs, is to show that Dr. Mantell's projections are "virtually identical to those reached by a defendant's economist." (*Id.*). However, as one federal court of appeals has explained:

> Once a witness has been designated as expected to testify at trial, there may be situations when the witness should be permitted to testify for the opposing party. In such situations, however, . . . a party should not generally be permitted to establish that the witness had been previously retained by the opposing party. While there may be situations where this fact should be disclosed to a jury, . . . the unfair prejudice resulting from disclosing this fact usually outweighs any probative value.

*Peterson v. Willie*, 81 F.3d 1033, 1037-38 (11th Cir. 1996) (finding the district court erred in allowing defense counsel to elicit that expert witness had previously been retained by plaintiff's attorney); *see also Ferguson v. Michael Foods, Inc.*, 189 F.R.D. 408, 410 (D. Minn. 1999) (denying the plaintiff's motion to call the defendant's medical expert as a witness during her case-in-chief due to the risk of unfair prejudice, because "even if the court were to order plaintiff not to mention who hired him originally, there is a substantial risk that the jury would be able to figure out how the expert became involved in the case"); *Rubel v. Eli Lilly & Co*., 160 F.R.D. 458, 460 (S.D.N.Y. 1995) ("[P]ermitting one party to call an expert previously retained or consulted by the other side entails a risk of very substantial prejudice stemming from the fact of the prior retention, quite apart from the substance of the testimony. One leading commentator aptly has characterized the fact of the prior retention by the adversary as 'explosive.'" (quoting 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure: Civil* § 2032, at 447

(1994))).  In other words, courts have found that it is unfairly prejudicial to allow a party to capitalize on the fact that an expert was initially retained by another party, which is precisely what Plaintiffs seek to do here.  It is within the Court's discretion to deny a request to call an opposing party's expert as part of the plaintiff's case-in-chief where the proffered reason does not outweigh the risk of unfair prejudice.  *See Sanchez v. Dupnik*, 362 F. App'x 679, 681 (9th Cir. 2010).  The Court finds that this is such a case, because McCabe's testimony would be duplicative of Dr. Mantell's testimony, and, contrary to Plaintiffs' assertion that they "have every right to have [McCabe] identify himself as an economist retained by Dr. Singh" (Dkt. 199 at 6), presenting such information to the jury would be highly and unfairly prejudicial to Dr. Singh.

## CONCLUSION

For the reasons set forth above, the Court: (1) denies Dr. Kothari's motion to preclude testimony by Dr. Mantell (Dkt. 167); (2) denies Plaintiffs' motion to preclude testimony by Carnegie (Dkt. 168); (3) denies Plaintiffs' motion to preclude Dr. Amin from providing opinion testimony as to deviation from good and accepted medical practice on the  part of Dr. Mallavarapu or any other defendant or former defendant (Dkt. 169); (4) denies Plaintiffs' motion to preclude Dr. Joy-Pardi from providing opinion testimony as to deviation from good and accepted medical practice on the  part of Dr. Mallavarapu or any other defendant or former defendant (Dkt. 170); (5) grants Plaintiffs' motion to preclude cross-examination of Dr. Mantell regarding prior judicial criticism (Dkt. 172); (6) denies Dr. Singh's motion to strike Dr. Mantell's expert opinions (Dkt. 176); and (7) denies Dr. Singh's  cross-motion  to  preclude  Plaintiffs  from  introducing  evidence  that  Dr.

Mallavarapu did not commit malpractice (Dkt. 184). The Court further holds that Plaintiffs will not be permitted to call McCabe as a witness in their case-in-chief but will be able to present Dr. Duncan's deposition testimony as part of their case-in-chief. The Court finds that Dr. Singh's request to preclude Plaintiff from introducing deposition testimony by Dr. Deak, Dr. Buckley, and Dr. Mallavarapu is premature. Any application by Plaintiffs to reopen expert discovery for the limited purpose of examining Drs. Amin and Joy-Pardi as to Dr. Mallavarapu's treatment of Decedent shall be made by February 12, 2021.

       SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated: January 22, 2021
       Rochester, New York